UNITED STATES of America, Plaintiff,

v.

James H. DONDICH, Max H. Mortensen, Louis M. Mayo, Jr., Roger W. Osness and Roy J. Jackson, Defendants.

Crim. No. 78–202 WHO.

United States District Court, N. D. California.

Sept. 11, 1978.

G. William Hunter, U. S. Atty., Edmund D. Lyons, Jr., Asst. U. S. Atty., Mark N.

Zanides, Sp. Asst. U. S. Atty., San Francisco, Cal., for plaintiff.

Richard L. Jaeger, San Francisco, Cal., for Dondich.

Claudia Wilken, Wilken & Leverett, Oakland, Cal., for Mortensen.

Steven Arian, San Francisco, Cal., for Mayo.

James E. Sharp, N. Richard Janis, Sharp, Randolph & Janis, Washington, D. C., Ralph R. Scott, Los Angeles, Cal., for Osness.

Marcus S. Topel, San Francisco, Cal., for Jackson.

## OPINION

ORRICK, District Judge.

Charging that his Fifth Amendment right to be indicted by a grand jury was violated by the participation in the proceedings of a Securities and Exchange Commission ("SEC") lawyer who, having conducted a civil investigation and having obtained injunctive relief against him, allegedly had a conflict of interest, defendant Roger W. Osness moves to dismiss the indictment against him and four other defendants for federal securities law violations. For the reasons hereinafter set forth, the motion is denied.

### I.

On April 27, 1978, the five defendants herein were indicted on eighteen counts for conspiracy, securities fraud, inducement to travel interstate in the execution of a scheme to defraud, mail fraud, and wire fraud. The charges arose from the sale of bond anticipation notes to finance development on Quimby Island, a State reclamation district located in the Sacramento River Delta. The indictment charges that defendants, having full knowledge that plans for the construction of recreational facilities on Quimby Island had been abandoned, continued to market securities through means of false and fraudulent misrepresentations to the investing public. Defendant Osness was president of a securities distribution firm which is alleged to have participated in the sale of Quimby Island notes.[1]

Because defendant's attack on the indictment is grounded upon both an alleged actual conflict of interest and the appearance of such a conflict created by the dual role played by the SEC attorney, Mark N. Zanides, in the civil and grand jury proceedings, it is necessary to trace Zanides' participation in both proceedings.

On October 3, 1975, the SEC entered a Formal Order of Private Investigation initiating an agency inquiry into alleged improprieties in the sale of Quimby Island notes. Zanides was assigned to work on the project on December 5, 1975, and he continued to do so until its conclusion in May, 1976. His activities included the taking of testimony from two of the criminal defendants herein (not including defendant Osness), the issuance of administrative subpoenas, and the analysis of evidence. In May, 1976, Zanides recommended civil injunctive action against twenty-one individuals, including all five criminal defendants in this action.

An SEC complaint, which Zanides drafted and signed, was filed on June 16, 1976, against twenty-one civil defendants, including all five criminal defendants herein. By February, 1977, all but two had consented to the entry of final orders against them without admitting or denying the allegations of the complaint. Osness himself consented on August 31, 1976. The two remaining defendants, Dondich and Mayo, were defaulted in January and October, 1977, respectively.

On September 30, 1976, during the pendency of the civil action, Zanides received a letter from the Department of Justice Organized Crime and Racketeering Section requesting access to the SEC investigative

---

1. Defendant Max H. Mortensen was the General Manager of the Quimby Island Reclamation District. Defendants James H. Dondich and Louis M. Mayo are alleged to have participated in the distribution of securities to defendant Roger W. Osness and others. Defendant Roy J. Jackson is alleged to have participated in the direct sale of notes to the public.

files. Zanides responded that the files could not be released without formal SEC approval, which was sought and finally obtained on November 1, 1976. The SEC referral did not contain any recommendation for criminal prosecution. After notifying the Department of Justice' that its request for access had been granted, Zanides had no further contact with the United States Attorney until June, 1977.[2]

The SEC investigation resulted in two additional sets of civil administrative proceedings, neither of which involved any of the criminal defendants herein. The first, involving five Florida defendants, was terminated by settlement in April, 1977. Zanides was consulted by the Miami branch office of the SEC, but did not actively participate in the proceedings. The second, involving four registered broker-dealers, was handled by the San Francisco branch office, and Zanides assisted in the preparation of documents submitted by the SEC in that action. This proceeding was effectively terminated by September, 1977.

In June, 1977, Zanides met for the first time with the Assistant United States Attorney assigned to the criminal investigation of the case. Zanides was appointed a Special Assistant to the United States Attorney on September 30, 1977, and during the period from October 13, 1977, to April 27, 1978, he assisted in the presentation of evidence to the grand jury, appearing on thirteen occasions for that purpose. During this period, Zanides remained on the staff of the SEC and worked on unrelated cases in that capacity. Zanides continues to assist in the present criminal prosecutions.

On January 5, 1978, during the period in which Zanides was assisting in the grand jury presentation, a third-party complaint was filed (in a separate, though related, civil suit) by one of the criminal defendants herein (Mortensen) naming Zanides, the SEC, and other public officials as defendants.[3] Insofar as the SEC and Zanides were concerned, the complaint charged, in essence, that the civil injunctive actions against the Quimby Island Reclamation District ("District") had made it impossible to market District securities, hence causing District insolvency and resulting in civil actions against the officers thereof. No allegations were made of improprieties in the SEC civil investigation itself. Third-party plaintiff Mortensen stipulated to a dismissal of the complaint with prejudice on April 2, 1978. During the entire period in which the complaint was effectively pending, Zanides made no appearances before the grand jury.[4]

## II.

Armed with the above facts, defendant argues, first, that the Sixth Circuit's recent decision in *General Motors Corp. v. United States*, 573 F.2d 936 (6th Cir. 1978), (herein-

2. There exists a discrepancy in the government's affidavits with respect to the date upon which Zanides began conferring with the United States Attorney's Office. Zanides claims to have begun on June 23, 1977. The affidavit of Assistant United States Attorney John H. Lockie places his first meeting with Zanides on April 21, 1977. This discrepancy, though unexplained, is not material to defendant's allegations.

3. This complaint arose out of a related civil suit, *Colca, et al. v. Mortensen, et al.*, C–77–1153 SC, a class action by private plaintiffs seeking recovery for allegedly fraudulent sales of Quimby Island securities by Mortensen and others. The third-party complaint, drawn by Mortensen *in propria persona*, seeks indemnification from some forty defendants, including Jesse Unruh, Treasurer of the State of Califor-

nia, several local political figures in Contra Costa County, the County itself, the Board of the Quimby Island Reclamation District, the SEC, and twenty John Does. The gist of the complaint was that these officials, in the exercise of their public and prosecutorial duties, harmed plaintiff by making it impossible for him to market further Quimby Island securities. This Court finds the complaint wholly frivolous.

4. The third-party complaint was filed on January 5, 1978. By letter dated March 17, 1978, Mortensen informed the district court that he had agreed to a dismissal of the complaint with prejudice. Zanides' affidavit indicates that he made no appearances before the grand jury during the period from December 16, 1977, to March 27, 1978.

after cited as "*GM*") [5] compels dismissal of the pending indictment. There the court held [6] that participation in a grand jury proceeding by an Internal Revenue Service ("IRS") attorney, who was active in a simultaneous civil investigation, created "the appearance of a conflict of interest" serious enough to vitiate the grand jury investigation. *Id.* at 942.

Second, defendant argues, without relying on *GM*, that Zanides' participation in the grand jury proceedings was improper because it enabled him to use "all the evidence and information * * * developed during the S.E.C. civil investigation for presentation before the grand jury" (defendant's brief at 11) and, therefore, the indictment must be dismissed. Neither argument has merit.

### A.

The facts in *GM* are very different from those in the case at bar, thus making it totally inapposite here.

In *GM*, the IRS attorney in question, Meno W. Piliaris, had been active in a civil investigation involving prior-year tax returns filed by the General Motors Corporation. Following General Motors' refusal to submit to certain discovery, Piliaris drafted a letter to the Department of Justice recommending that a grand jury investigation be undertaken. This letter also made clear the fact that, at the appropriate time, the IRS intended to seek access to evidence produced by the grand jury for use in its concurrent civil proceedings. It was thus apparent that the IRS planned to handle the General Motors civil tax matter in coordination with the grand jury investigation.

Piliaris was subsequently designated a Special Attorney for the United States, empowered to assist in the presentation of evidence to the grand jury. In this role, he was privy to all evidence developed in the course of that proceeding. In addition, during the grand jury investigation, General Motors complained to prosecutors about allegedly abusive tactics and improper behavior by the IRS in the course of the civil investigation in which Piliaris had participated. Nevertheless, Piliaris continued to appear before the grand jury.

The court found that Piliaris' participation in the grand jury proceeding, in light of his prior role in the IRS investigation, created "the appearance of a conflict of interest," and that such an appearance required termination of the grand jury investigation. *Id.* at 942, 945. In reaching this conclusion, the Sixth Circuit emphasized three circumstances which, in its view, justified the result.

The court's most important objection was to the possibility that Piliaris could obtain evidence generated by the grand jury for use by the IRS in civil proceedings. Stressing the impropriety of "using criminal procedures to elicit evidence in a civil case," [7] the court indicated that Piliaris' access to secret grand jury hearings placed him "in a conflicting and intolerable position." *Id.* at 942, 943. The court appeared to view Piliaris' participation in the criminal proceeding as a means by which to further the IRS civil investigation—a role clearly at odds with his duties as a prosecutor.

Second, the court was concerned that Piliaris, who had actively participated in the IRS civil investigation, and had himself recommended a criminal investigation, might be excessively interested in having the grand jury return an indictment which could serve to justify his own actions. *Id.* at 943. Such a desire on Piliaris' part was inconsistent, in the eyes of the court, with the traditional function of grand jury and prosecutor "to protect citizens against unfounded criminal prosecution." *Id.* at 943.

---

**5.** On May 9, 1978, the United States petitioned the Sixth Circuit for a rehearing or, in the alternative, a hearing *en banc*. The court proceeded to hear arguments *en banc* on June 13, 1978, and the decision is presently pending.

**6.** Judge Celebrezze joined in the opinion by Judge Weick. Judge Merritt dissented in a separate opinion.

**7.** Quoting from *United States v. Procter & Gamble Co.*, 356 U.S. 677, 683, 78 S.Ct. 983, 987, 2 L.Ed.2d 1077 (1958).

In addition, the possibility that Piliaris could be so motivated constituted, according to the court, the appearance of a conflict of interest, in violation of Canon 9 of the Code of Professional Responsibility and of Standard 1.2 of the Standards Relating to the Prosecution Function.

Third, the fact that Piliaris had actively participated in the civil investigation made it unlikely, according to the court, that he would be properly receptive to General Motor's complaints concerning abusive investigatory tactics. The court acknowledged General Motor's claim that Piliaris may have been "more interested in justifying * * * the conduct of the IRS agents than in protecting GM against unfounded criminal prosecution." *Id.* at 943.

These factors, which combined in *GM* to create an appearance of a conflict of interest, are simply not present in the instant case.

Because the SEC civil proceedings against these defendants had been effectively terminated prior to Zanides' active participation in the grand jury investigation, there existed no threat that evidence generated by the latter could be improperly utilized by the SEC. As noted above, all substantive proceedings by the SEC against these defendants had been terminated by February, 1977, several months prior to Zanides' first real involvement in the criminal investigation. The SEC neither recommended nor initiated the grand jury investigation, nor is there any reason to believe that it intended at any time to seek access to evidence produced thereby. There has been no suggestion that future SEC action on this matter, which could benefit from access to grand jury information, was anticipated. In short, defendant has failed to demonstrate any reason why the SEC might wish to obtain the fruits of the criminal investigation for its own use.

Furthermore, Zanides, unlike Piliaris, made no recommendation for criminal pros-

ecution to the Department of Justice, but merely responded to the Department's requests for information. This circumstance, together with the fact that he had already participated in a successful injunctive action in the matter, makes it far less likely that Zanides had "an axe to grind" before the grand jury. And, as discussed below (*see* III, *infra*), to the extent that Zanides did have an interest in seeing the investigation produce a successful prosecution, it is unclear in what way he differs from any other zealous prosecutor.

Finally, defendant Osness, unlike General Motors, makes no claim that abusive tactics were employed by the SEC in its civil investigation. Rather, he alleges that defendant Mortensen's third-party complaint, naming Zanides and the SEC as defendants, created for Zanides a conflict of interest serious enough to require dismissal of the indictment. The Court rejects this contention. Having carefully examined the Mortensen complaint (*see* n.3, *supra*), the Court finds it to be wholly frivolous. Mortensen appears to be complaining that the SEC civil action and the resulting injunction, to which he consented, prevented the District from meeting prior financial obligations. Such allegations fail to state any claim upon which relief could be granted. It therefore appears unlikely in the extreme that Zanides would be influenced by such a document to adjust or alter his behavior before the grand jury.[8] Furthermore, at no time during the effective pendency of the complaint did Zanides actually appear before the grand jury. *See* n.4, *supra*.

For these reasons, the Court finds *GM* inapposite to the facts presented here and defendant's argument based thereon totally without merit. The circumstances upon which the Sixth Circuit based its decision do not exist in the instant case, nor has defendant called to the attention of the Court other facts which, examined in the light of *GM,* could support a finding that the appearance of a conflict was present.

8. Even had the allegations in the complaint been substantial, Zanides' absolute immunity as a public prosecutor would eliminate any motivation on his part to use the grand jury to gain advantage in the civil suit. *See Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); *Flood v. Harrington,* 532 F.2d 1248, 1250 (9th Cir. 1976).

854

## B.

Equally without merit is defendant's argument that Zanides' participation in grand jury proceedings was improper because it enabled him to use "all the evidence and information * * * developed during the S.E.C. civil investigation for presentation before the grand jury." Defendant's brief at 11.

The SEC is authorized by statute to transmit to the Attorney General any evidence it may have concerning potential criminal violations of federal securities regulations.[9] Here, the Department of Justice made a formal request for information and was granted complete access to SEC investigatory files. Defendant does not suggest that the use of those files in the grand jury investigation was in any way inappropriate. It is, therefore, difficult to understand how the participation of Zanides transforms an otherwise lawful and proper exchange of information into an improper one. The Court finds that it did not.

This conclusion is supported by the Supreme Court's recent ruling in *United States v. LaSalle National Bank,* —— U.S. ——, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978). There, the Court was confronted by the use of IRS administrative subpoenas for the accumulation of evidence to be used in criminal prosecution. In an opinion by Justice Blackmun, the Court held that although the use of civil investigatory procedures *solely* for criminal purposes was improper, the agency need only act "in good faith," thus placing upon defendants a "heavy burden" to demonstrate otherwise. *Id.* at 2367.[10] Justice Blackmun stressed the importance of cooperation in effective law enforcement:

"Interagency cooperation on the calculation of civil liability is then to be expected and probably encourages efficient settlement of the dispute. But such cooperation, when combined with the inherently intertwined nature of the criminal and civil elements of the case, suggests that it is unrealistic to attempt to build a partial information barrier between the two branches of the executive. Effective use of information to determine civil liability would inevitably result in criminal discovery. The prophylactic restraint on the use of the summons effectively safeguards the two policy interests while encouraging maximum interagency cooperation." *Id.* at 2365.

Defendant has not even approached the showing necessary to demonstrate bad faith on the part of the government. The SEC investigation actually resulted in successful civil enforcement proceedings against these and other defendants. Any attempt to argue that the civil investigation was employed as a subterfuge to broaden criminal discovery simply does not square with the facts before the Court.

■ This Court, therefore, finds that attorney Zanides' participation in the grand jury investigation created neither an actual conflict of interest nor the appearance of such a conflict.

## III.

Because the issue raised by defendant in his motion to dismiss is apparently one of first impression in this Circuit, the Court feels compelled to set forth its views regarding the wisdom of the holding in *GM.* Even if *GM* were closely in point here, the

<hr>

9. Securities Act of 1933, § 20(b), 15 U.S.C. § 77t(b) (1970); Securities Exchange Act of 1934, § 21(d), 15 U.S.C. § 78u(d) (1970).

10. The Court described the standard of agency "good faith" as follows:

"[T]he question whether an investigation has solely criminal purposes must be answered only by an examination of the institutional posture of the IRS. Contrary to the assertion of respondents, this means that those opposing enforcement of a summons do bear the

burden to disprove the actual existence of a valid civil tax determination or collection purpose by the Service." *United States v. LaSalle National Bank, supra,* 98 S.Ct. at 2367.

While this Court agrees with Justice Blackmun's analysis of the policy underlying the decision, it also emphatically agrees with Justice Stewart's dissent to the effect that "the Court's new criteria will prove wholly unworkable." *Id.* at 2369.

Court is not convinced either that it was correctly decided or that this Circuit ought to adopt its reasoning.

*GM* presents, in sharp relief, a conflict between two competing principles fundamental to our notion of criminal justice. On the one hand, it involves the sanctity of the grand jury, an institution whose historic mission has been "to clear the innocent, no less than to bring to trial those who may be guilty." *United States v. Dionisio,* 410 U.S. 1, 16–17, 93 S.Ct. 764, 773, 35 L.Ed.2d 67 (1973); *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). This critical task cannot be achieved in the absence of independent, unbiased prosecutors whose concern for justice transcends all other considerations. Standing in juxtaposition is the increasing need for cooperation among government attorneys and agencies in the enforcement of ever more complex civil and criminal regulations. *United States v. LaSalle National Bank, supra; In re Subpoena of Persico,* 522 F.2d 41 (2d Cir. 1975). Obviously, a fair and effective system of criminal justice demands that these values and interests be reconciled. In the Court's view, *GM* does not strike a balance which will prove effective and workable.

■ Initially, it appears that the Sixth Circuit did not sufficiently concern itself with the appropriate role of the federal courts in the reexamination of grand jury proceedings. It is well established that judicial supervisory power over grand jury proceedings must be exercised with extreme care because "the drastic nature of the remedy provided by the exercise of its supervisory powers renders it essential that they not be applied indiscriminately to remedy every prosecutorial misstep." *United States v. Baskes,* 433 F.Supp. 799, 806 (N.D. Ill. 1977); *In re Grand Jury Subpoenas,* 581 F.2d 1103, (4th Cir. 1978). The Supreme Court has refused to authorize aggressive judicial intervention into grand jury proceedings in the absence of a substantial showing of prejudice by the defendant:

"If indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed. The result of such a rule would be that before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury. This is not required by the Fifth Amendment." *Costello v. United States,* 350 U.S. 359, 363, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956).

Federal courts have heeded this warning, and remain reticent to interfere with the outcomes of grand jury proceedings:

"Nevertheless, given the constitutionally-based independence of each of the three actors—court, prosecutor and grand jury—we believe a court may not exercise its 'supervisory power' in a way which encroaches on the prerogatives of the other two unless there is a clear basis in fact and law for doing so. If the district courts were not required to meet such a standard, their 'supervisory power' could readily prove subversive of the doctrine of separation of powers." *United States v. Chanen,* 549 F.2d 1306, 1313 (9th Cir. 1977), *cert. denied,* 434 U.S. 825, 98 S.Ct. 72, 54 L.Ed.2d 83 (1977).

*United States v. Mackey,* 405 F.Supp. 854 (E.D.N.Y. 1975); *United States v. Baskes, supra.* While this does not mean that federal courts may never intervene to dismiss an indictment,[11] it suggests that their power to do so should be exercised selectively.

Second, *GM*, in the Court's view, fails to give adequate recognition to the growing need for interagency cooperation in the enforcement of federal laws. The increasing-

---

11. Where charges of prosecutorial conduct have been substantial and supported by the evidence, federal courts have not hesitated to act. *See United States v. DeMarco,* 401 F.Supp. 505 (C.D.Cal. 1975), *aff'd,* 550 F.2d 1224 (9th Cir. 1977), *cert. denied,* 434 U.S. 827, 98 S.Ct. 105, 54 L.Ed.2d 85 (1977). (Prosecutor threatened to file more serious charges if defendant persisted in pressing constitutional rights); *United States v. Phillips Petroleum Co.,* 435 F.Supp. 610 (N.D.Okl. 1977) (Prosecutor concealed exculpatory evidence from the grand jury).

ly complex nature of federal criminal prosecutions demands that expert counsel be made available to assist the Department of Justice. In recent years, the Attorney General has made frequent use of his statutory power [12] to appoint Special United States Attorneys for this purpose. *See United States v. Morrison,* 531 F.2d 1089 (1st Cir. 1976), *cert. denied,* 429 U.S. 837, 97 S.Ct. 104, 50 L.Ed.2d 103 (1976); *In re Subpoena of Persico, supra.* Such appointments have not been limited to Department of Justice attorneys, but have often involved attorneys in the employ of other federal agencies. *See United States v. Denton,* 307 F.2d 336 (6th Cir. 1962), *cert. denied,* 371 U.S. 923, 83 S.Ct. 292, 9 L.Ed.2d 232 (1962); *Nick v. United States,* 406 F.Supp. 1 (E.D.Mo. 1975), *aff'd,* 531 F.2d 936 (8th Cir. 1976).

Furthermore, recent amendments to Rule 6(e) of the Federal Rules of Criminal Procedure [13] were expressly designed to facilitate the participation of agency attorneys in grand jury proceedings. The Report of the Senate Committee on the Judiciary states:

> "The Rule as redrafted is designed to accommodate the belief * * * that Federal prosecutors should be able, without the time-consuming requirement of prior judicial interposition, to make such disclosures of grand jury information to other government personnel as they deem necessary to facilitate the performance of their duties relating to criminal law enforcement." S.Rep.No. 95–354, 9th Cong., 1st Sess., *reprinted in* [1977] U.S. Cong. Code & Admin.News, p. 531.

The Advisory Committee's Note is equally clear as to the need for such cooperation:

> "The proposed amendment reflects the fact that there is often government personnel assisting the Justice Department in grand jury proceedings. In *In re Grand Jury Investigation of William H.*

*Pflaumer & Sons, Inc.,* 53 F.R.D. 464 (E.D.Pa. 1971), the opinion quoted the United States Attorney: 'It is absolutely necessary in grand jury investigations involving analysis of books and records, for the government attorneys to rely upon investigative personnel (from the government agencies) for assistance.'" Notes of the Advisory Committee on Rules to 1977 Amendments to Fed.R.Cr.P. 6(e), *reprinted at* 18 U.S.C. Rule 6(e) (Supp. 1978).

These passages signal that both the Congress and the Supreme Court support active participation by agency attorneys in grand jury investigations.

■ In light of the limited nature of judicial supervisory power over grand jury proceedings, and the current trend to encourage interagency cooperation, *GM* does not provide sufficiently compelling rationales for the exclusion of attorney Piliaris from the grand jury investigation. The court relied heavily on the American Bar Association Code of Professional Responsibility, as well as the Standards Relating to the Prosecution Function, to support its finding that Piliaris' participation created the appearance of a conflict of interest.[14] However, simultaneous involvement in investigative and prosecutorial aspects of federal enforcement proceedings does not appear to present the kind of conflict of interest addressed by the Code or the Prosecution Standards.

The examples of conflict situations presented by the Code and Standards to elucidate the bare canons suggest two major concerns. First, the acceptance of private employment by a former public official in a matter closely related to prior official responsibilities is thought to raise doubts as to the motives underlying the earlier per-

---

**12.** 28 U.S.C. § 515(a).

**13.** Fed.R.Cr.P. 6(e), 18 U.S.C., *as amended* by Pub.L. 95–78, § 2(a), 91 Stat. 319 (Supp. 1978).

**14.** Canon 9 of the American Bar Association Code of Professional Responsibility (1976) provides:

"A lawyer should avoid even the appearance of professional impropriety."
Part I, Standard 1.2(a) of the American Bar Association Standards Relating to the Prosecution Function provides:
"A prosecutor should avoid the appearance or reality of a conflict of interest with respect to his official duties."

formance of his or her public duties.[15] Second, interaction by officials, in the course of their public duties, with former clients or associates, is deemed to raise the specter of unfair bias or favoritism.[16]

Neither of these concerns was present in *GM*, where the IRS and Justice were acting in concert to seek out and prevent violations of federal law. Piliaris' acceptance of appointment as a Special Assistant United States Attorney in no way raises ethical questions about the prior performance of his duties as an IRS attorney, nor does his continued employment by the IRS appear likely to color his judgment as a prosecutor. As Judge Merritt points out in his dissent, Piliaris' involvement in both civil and criminal aspects of the investigation constitutes "a natural, not a sinister, sequence of events." *GM* at 947. And, as noted above, such use of investigatory personnel has become critical to the enforcement of complicated regulatory schemes. This Court, therefore, does not find cause for objection to Piliaris' activities based upon the Canons of Professional Responsibility or the Standards Relating to the Prosecution Function.

Nor does it appear to the Court, as it apparently did to the Sixth Circuit, that Piliaris' involvement in the IRS investigation, and his recommendation of criminal prosecution, may have rendered him unduly zealous to properly carry out his role as a prosecutor. This objection could apply to *any* prosecutor who has participated in lengthy investigation prior to empanelment of a grand jury, not merely to agency attorneys who are subsequently appointed Special Assistant United States Attorneys. The Court concurs with Judge Merritt's view that, although such prosecutors must avoid conflicts of interest, they can hardly be expected to remain "neutral." *Id.* at 947–48. Moreover, as the American Bar Association Standards for the Prosecution Function themselves point out:

"In situations where the prosecutor must prosecute an indictment returned by a grand jury, it is especially important that he be free to express his opinion. A prosecutor who has conducted an adequate investigation and analyzed the evidence is in a position to furnish guidance to the grand jury on the law and the weight of the evidence and should be free to do so whether this leads to a determination to indict or not to indict." Standards Relating to the Prosecution Function, Commentary to Part III, Standard 3.5 (Approved Draft 1971).

The Court, therefore, finds no reason to believe that agency counsel will be more likely than other public prosecutors to ignore their duty of fairness when appearing before grand juries.

For the same reasons, the Court finds the Sixth Circuit's reliance upon *American Cyanamid v. FTC*, 363 F.2d 757 (6th Cir. 1966) misplaced. In our system of criminal justice, prosecutors are advocates, and cannot realistically be required to comply with standards of impartiality appropriate for judges and other arbiters.[17]

■ Finally, *GM* overestimates both the need and the safeguards necessary to prevent disclosure of grand jury information to federal agencies for civil purposes. The prohibition against the use of grand jury evidence in civil investigations is not as ironclad as the court intimates. Although grand jury proceedings have traditionally been kept secret, *United States v. Procter &*

---

**15.** See American Bar Association Code of Professional Responsibility, DR 9–101(A) and (B) (1976).

**16.** See American Bar Association Standards for the Prosecution Function, Part I, Standard 1.2(b)(i), (ii) and (iii) (Approved Draft 1971).

**17.** Nor does reliance upon *United States v. Braniff Airways, Inc.,* 428 F.Supp. 579 (W.D. Tex. 1977), seem particularly appropriate. There, former Civil Aeronautics Board officer Burton Kolko attended grand jury proceedings concerning alleged antitrust violations by a group of air carriers. In his prior capacity at the CAB, Kolko had approved agreements which had become the subject of investigation. The court appeared to be concerned about the unnecessary influence which the presence of a "high CAB official" might have upon the grand jury. *Id.* at 583. The possibility of such influence in the *GM* case seems remote, given Piliaris' status as a staff attorney for the IRS.

*Gamble Co.,* 356 U.S. 677, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958), grand jury evidence may be used for civil purposes in appropriate cases. In *Procter & Gamble,* a grand jury investigation into alleged Sherman Act violations failed to produce an indictment. When grand jury transcripts were later used in civil proceedings, defendants objected. The Court, speaking through Justice Douglas, responded as follows:

> "We cannot condemn the government for any such practice in this case. There is no finding that the grand jury proceeding was used as a short cut to goals otherwise barred or more difficult to reach. It is true that no indictment was returned in the present case. But that is no reflection on the integrity of the prosecution. For all we know, the trails that looked fresh at the start faded along the way. * * * It is only when the criminal procedure is subverted that 'good cause' for *wholesale* discovery and production of a grand jury transcript would be warranted." *Id.* at 683–84, 78 S.Ct. at 987 (emphasis added).

As noted above (*see* p. 856, *supra*), recent amendments to Rule 6(e) of the Federal Rules of Criminal Procedure seek to liberalize the disclosure of grand jury material to appropriate government personnel. The Senate Report states:

> "There is, however, no intent to preclude the use of grand jury-developed evidence for civil law enforcement purposes. On the contrary, there is no reason why such use is improper, assuming that the grand jury was utilized for the legitimate purpose of a criminal investigation." S.Rep.No. 95–354, *supra*, at 532.

The restrictive posture adopted by the Sixth Circuit in *GM* is in conflict with this recent attempt by Congress and the Supreme Court to promote the exchange of information among federal investigators.[18]

In cases in which the disclosure of grand jury information to civil investigators would be inappropriate, safeguards short of dismissing the indictment are available. Rule 6(e) is, after all, designed to regulate government attempts to obtain such disclosure.[19] Protective orders against the disclosure of grand jury testimony can be issued, and, if in fact information has been improperly disclosed, it would appear more appropriate to halt the *civil* proceeding, which has improperly benefited from the grand jury investigation, than to dismiss the indictment.

■ The foregoing is not intended to imply that agency attorneys should never be disqualified from participation in grand jury proceedings, or that indictments may never be quashed. Where, for example, serious allegations are made that a former agency attorney, now serving as a special prosecutor, engaged in or directed abusive, illegal, or improper investigatory techniques, disqualification and dismissal may be appropriate. In such circumstances, the pressure to avoid careful attention to such allegations would be great. Furthermore, such allegations may require the special prosecutor to become a witness before the grand jury—a role he or she could not properly play. *United States v. Treadway,* 445 F.Supp. 959 (N.D.Tex. 1978).

---

**18.** The facts of *General Motors* make it possible that the IRS had indeed sought to use the grand jury proceeding "as a short cut to goals otherwise barred or more difficult to reach," in clear violation of the rule set forth in *Procter & Gamble.* Insofar as the Sixth Circuit based its decision upon such a finding, we have far less cause for disagreement. However, the extent to which the court took this view is not made clear in its opinion.

**19.** Fed.R.Cr.P. 6(e)(2)(B), (C), 18 U.S.C. (Supp. 1978). In a recent case before the Fourth Circuit, the target of a grand jury investigation sought an order requiring the district court to investigate alleged abuses of the grand jury process by the IRS. *In re Grand Jury Subpoenas,* 581 F.2d 1103 (4th Cir. 1978). The petitioner was contending that the grand jury had been convened to obtain evidence for use in a stymied IRS civil investigation. The court refused to order such an inquiry, holding that Rule 6(e) provides sufficient safeguards against such abuse:

> "[W]e are of the opinion that petitioner's legitimate interests are fully protected by Rule 6(e). Disclosure to the IRS for civil enforcement purposes requires a court order predicated on a demonstration of good faith. Unauthorized disclosure is deterred by the threat of contempt." *Id.* at 1110.

For all of the above reasons, the Court finds that neither a conflict of interest, nor the appearance thereof, was present in the circumstances before it. Mindful of its responsibility to insure that the grand jury proceedings were uncorrupted by bias or other unfairness, the Court finds nothing improper in the government's behavior with respect thereto. Defendant's motion is denied.