**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Louis M. MAYO, Jr., and James Harold Dondich, Defendants-Appellants.**

**Nos. 79–1360, 79–1399.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 14, 1980.

Decided May 26, 1981.

Rehearing and Rehearing En Banc Denied Sept. 14, 1981.

**371**

J. Frank McCabe, San Francisco, Cal., argued for Mayo; Goorjian & McCabe, on brief.

Richard L. Jaeger, San Francisco, Cal., argued for Dondich; Feldman, Waldman & Kline, San Francisco, Cal., on brief.

Mark N. Zanides, Asst. U. S. Atty., San Francisco, Cal., for plaintiff-appellee.

Before SCHROEDER and FLETCHER, Circuit Judges, and CLAIBORNE,* District Judge.

PER CURIAM:

Appellants Louis M. Mayo and James Harold Dondich appeal from their convictions for mail fraud and securities fraud, in violation of 18 U.S.C. §§ 371, 2314, 1341, 1343 and 15 U.S.C. §§ 77q(a), 77x, 78j(b), 78ff(a). We affirm.

I

FACTS

Appellants Mayo and Dondich were found guilty on all counts of an 18–count indictment. Three co-defendants, Mortensen, Osness, and Jackson, were acquitted on all counts. To sum up a long and complex factual record, the appellants were involved in a scheme to market debt securities of Quimby Island Reclamation District No. 2090 (the District) at a time when it was losing money and probably had a negative net worth. In promotional material used to sell the securities, the District's assets were represented to have a value in excess of $100 million. Listed as part of the assets, at a value of $95 million, was a ranch in Colombia which appellant Dondich had

* The Honorable Harry E. Claiborne, United States District Judge for the District of Nevada, sitting by designation.

deeded to the District in return for $5 million of general obligation bond anticipation notes (gobans). Dondich had no interest in the ranch which he could convey. Mayo and Dondich were both aware of these facts. In the course of their dealings, the appellants knowingly made false representations to prospective purchasers of the gobans, securities brokers who planned to resell the gobans to their own customers using the false information furnished by the appellants. Sales were in fact made relying on the false information.

II

SUFFICIENCY OF THE EVIDENCE

Mayo and Dondich argue that the evidence was insufficient to support their convictions on counts III through XI of the indictment. These counts charged all defendants with violations of 15 U.S.C. § 77q(a) (fraudulent interstate transaction in the offer or sale of securities) and 18 U.S.C. § 2 (aiding and abetting). Appellants argue that they were merely aiders and abettors in the sales of the gobans and that, since the principals were acquitted, they likewise must stand acquitted as a matter of law. *See United States v. Oscar*, 496 F.2d 492, 493 (9th Cir. 1974).

Mayo and Dondich could themselves be held liable as principals under 15 U.S.C. § 77q(a), however. To sustain a conviction under this section, the Government is not required to show that a defendant was the actual offeror or seller of the security; rather, it is enough to show that the defendant knowingly and actively participated in a fraudulent scheme which resulted in the offer or sale. *See United States v. Farris*, 614 F.2d 634, 638–39 (9th Cir. 1979), *cert. denied*, 447 U.S. 926, 101 S.Ct. 920, 66 L.Ed.2d 839 (1980). Viewing the evidence in the light most favorable to the Government, the jury reasonably could have found that Dondich and Mayo were

involved in a fraudulent scheme to market the District's worthless gobans. The record contains substantial evidence that Mayo and Dondich made knowing and material misrepresentations which were intended to result and did result in sales to brokers and in resales to their customers. There is also ample evidence in the record that Mayo and Dondich knowingly and deceitfully caused the District to transfer assets without adequate consideration.

## III

### ADMISSIBILITY OF EVIDENCE OF PAST CRIMES

■ Dondich argues that the court below committed reversible error in admitting evidence which constituted "thinly veiled allusions to Dondich's criminal record." Dondich refers to various statements made at trial to the effect that Dondich was the subject of a pending FBI investigation, and had legal problems so serious in nature that he could not travel freely. Dondich argues that these statements constitute evidence of his criminal character and were offered by the Government to prove his guilt.

Under Fed.R.Evid. 404(b), evidence of past crimes or wrongful acts is admissible for purposes such as proof of motive, state of mind, or intent. In this case, the record shows that the challenged evidence was admitted to show the motive, state of mind, and intent of a co-defendant, Mortensen. Although the evidence may have been admissible as against Mortensen, it was inadmissible against Dondich and its use against him was therefore improper. However, in view of the strong case against Dondich independent of the challenged evidence, and in light of the trial court's limiting instructions, we find the error to be harmless.

## IV

### DOUBLE JEOPARDY

■ Dondich contends that his conviction violates the double jeopardy clause of the fifth amendment. In 1976, Dondich and seven others (none of whom were defendants in this case) were convicted in the Central District of California on charges of conspiracy. The indictment alleged that Dondich and his co-defendants had used a number of "sham corporations" to induce investors to purchase futures contracts for the sale and delivery of sugar. The defendants had allegedly represented that the assets of one of the "sham corporations" included a ranch in Colombia—the same ranch involved in the case at bar. To establish the facts surrounding the true ownership of the Colombian ranch, the Government called the same witnesses in the sugar futures case as in the case at bar.

Dondich was convicted, and his conviction was affirmed on appeal. *United States v. Dondich*, No. 76–1221 (9th Cir. Nov. 14, 1977) (unpublished memorandum), *cert. denied*, 436 U.S. 906, 98 S.Ct. 2238, 56 L.Ed.2d 405 (1978). Dondich now argues that the conspiracy for which he was convicted in the Central District of California and the conspiracy alleged in this case in fact constitute one giant, overall conspiracy, and that his conviction here thus violates the double jeopardy clause. *See United States v. Westover*, 511 F.2d 1154 (9th Cir.), *cert. denied*, 422 U.S. 1009, 95 S.Ct. 2633, 45 L.Ed.2d 673 (1975).

In *Arnold v. United States*, 336 F.2d 347, 349–50 (9th Cir. 1964), *cert. denied*, 380 U.S. 982, 85 S.Ct. 1348, 14 L.Ed.2d 275 (1965), we held that an offense charged in a second indictment violates the double jeopardy clause only if the proof of the matter set out in the second indictment would be admissible as evidence under the first indictment, and could sustain a conviction under the first indictment. We compared the differences in the periods of time covered by the alleged conspiracies, the places where the conspiracies were alleged to occur, the persons charged as co-conspirators, the overt acts alleged to have been committed, and the statutes alleged to have been violated. Applying these factors to the facts of this case, it is obvious that the conspiracy alleged here was completely distinct from the sugar futures conspiracy. The two involved different co-conspirators, different victims, different purposes, different time-

spans, different locales, and different sections of the United States Code. The only similarity between the two was a similar use of the Colombian ranch. The second conviction thus does not violate the double jeopardy clause. *See Rogers v. United States*, 609 F.2d 1315, 1317–18 (9th Cir. 1979).

## V

### APPEARANCE OF PROSECUTORIAL IMPROPRIETY

■ Appellants argue that the indictment should have been dismissed because one Zanides, a former SEC attorney who had been involved in a civil investigation of the appellants' alleged misconduct, had later participated in the criminal investigation on behalf of the Justice Department. It is clear that Zanides had no actual conflict of interest, but appellants argue that the appearance of impropriety warrants dismissal of the indictment. This argument was also raised before the trial court, *see United States v. Dondich*, 460 F.Supp. 849 (N.D. Cal.1978), and the trial court's analysis was specifically approved by this court in *United States v. Wencke*, 604 F.2d 607, 611 (9th Cir. 1979). There is no merit to appellants' position.

## VI

### PROPRIETY OF PRISON TRANSFER

■ As a result of his conviction in the Central District of California, Dondich was incarcerated in the United States Prison Camp in Lompoc, California at the time the grand jury returned the indictment in the present case. Seven months later, Dondich was transferred to the Federal Correctional Institution at Safford, Arizona. Dondich alleges that the Government has never given a justifiable reason for the transfer; that, as a result of the transfer, he lost some living privileges and some papers; and that his San Francisco counsel had more difficulty conferring with him while he was incarcerated in Safford than in Lompoc.

Dondich asks us to reverse his conviction on this ground, as a prophylactic against willful prosecutorial misconduct. *See United States v. Gerard*, 491 F.2d 1300, 1302–03 (9th Cir. 1974). The record reveals no prosecutorial misconduct, since Dondich's rights were not violated by this transfer. No statutes or regulations were violated and Dondich's interests in remaining at Lompoc and retaining his living privileges do not implicate the due process clause of the fifth amendment. *See Walker v. Hughes*, 558 F.2d 1247, 1252–53 (6th Cir. 1977); *Smith v. Saxbe*, 562 F.2d 729, 734 (D.C. Cir. 1977); *see also Meachum v. Fano*, 427 U.S. 215, 224–26, 96 S.Ct. 2532, 2538–39, 49 L.Ed.2d 451 (1976).

Dondich also argues that the prison transfer denied him his sixth amendment right to counsel. To sustain this argument, he must at least show that he was prejudiced by the inter-prison transfer, *Cooper v. Fitzharris*, 586 F.2d 1325, 1330–31 (9th Cir. 1978) (*en banc*), *cert. denied*, 440 U.S. 974, 99 S.Ct. 1542, 59 L.Ed.2d 793 (1979), and he has failed to show this. He has not shown how the papers which he supposedly lost or misplaced in the course of the transfer would have aided his defense, nor has he shown that the Government denied him access to his counsel while he was incarcerated in Safford. Dondich's argument thus lacks merit.

## VII

### PROPRIETY OF VOIR DIRE

On the fourth and fifth days of trial, counsel for Mayo called the court's attention to local newspaper articles which discussed the Government's allegations in this case and mentioned that Mayo had twice previously been convicted of federal crimes. In response to a request to *voir dire* the jurors, the court asked the panel if they had heard or seen anything about the case in the media. None of the jurors responded affirmatively, and the court specifically found that there was a negative response from each juror, including the two alternates. The court declined to question the jurors individually.

■ Where pretrial publicity is not substantial, a trial judge is not required to

interrogate the prospective jurors at length about it. Unless the trial judge has clearly erred in estimating the action needed to uncover and prevent prejudice from pretrial publicity, an appellate court should not intervene. *United States v. Polizzi*, 500 F.2d 856, 880 (9th Cir. 1974), *cert. denied*, 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975). Here, the pretrial publicity was not so substantial as to require the trial judge to conduct the thorough *voir dire* which appellants contend was necessary. The court below did not abuse its discretion in refusing to question the jurors individually.

## VIII

### SEVERANCE

■■■■ During the trial, Mayo moved to sever his trial from that of Dondich in order to allow him to use Dondich's allegedly exculpatory testimony. Mayo now argues that the trial judge erred in denying the motion to sever. Such a motion is addressed to the discretion of the trial court, and should be granted only where the moving party can demonstrate that he would call the co-defendant to testify at the severed trial, that the co-defendant would in fact testify, and that the testimony would be favorable to the moving party. *United States v. Seifert*, 648 F.2d 557, 563 (9th Cir. 1980); *United States v. Vigil*, 561 F.2d 1316, 1317 (9th Cir. 1977).

Dondich's testimony at a severed trial would not necessarily have been favorable to Mayo. Dondich was prepared to testify that Mayo was acting at his direction in signing a false signature to certain documents. However, the gravamen of Mayo's alleged offense was not that the signature was unauthorized, but rather that it was false. We find that the trial court did not abuse its discretion in denying the motion to sever.

## IX

### INSTRUCTION ON MULTIPLE CONSPIRACIES

■■■■ At trial, the court denied Mayo's request for an instruction dealing with mul-

tiple conspiracies. Mayo and Dondich now argue that there was a prejudicial variance between the indictment and the proof because the jury could have found that the scheme to transfer the Colombian ranch, the schemes to market the gobans, and the scheme to defraud the shareholders of one of the corporate purchasers of the gobans constituted four separate and distinct conspiracies.

It is possible for several sales of securities to be made to different members of the public under different circumstances, but with the same, unifying purpose of bilking the unsuspecting public by foisting worthless stock upon it. Such is the case at bar. Under such circumstances, there is no prejudicial variance and the failure of the trial court to instruct on multiple conspiracies does not constitute reversible error. *United States v. Perry*, 550 F.2d 524, 531 (9th Cir.), *cert. denied*, 431 U.S. 918, 98 S.Ct. 104, 53 L.Ed.2d 228 (1977); *United States v. Finkelstein*, 526 F.2d 517, 521–22 (2d Cir. 1975), *cert. denied*, 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976). The jury could rationally find that Dondich and Mayo combined in a single conspiracy for a single purpose— to receive financial gains by causing the sales of securities which had been rendered practically worthless.

## X

### COMPETENCE OF COUNSEL

■■■■ After Mayo's counsel had made his closing argument, Mayo filed a *pro per* motion for mistrial on the ground that his attorney was grossly negligent and incompetent. In a letter appended to his declaration in support of the motion, Mayo alleged that his attorney was rarely available to confer with him prior to trial; was seldom available during the lengthy trial; refused to subpoena defense witnesses; was absent during the trial; failed to arrange a meeting with other defense counsel; failed to give Mayo a copy of the indictment; failed to discuss his closing argument with Mayo

before delivering it; and finally, told Mayo that he "just [couldn't] handle [the trial]." The court denied the motion for mistrial on the grounds that the matter could, if necessary, be raised in a motion pursuant to 28 U.S.C. § 2255, and that based upon what the trial judge had seen during the trial, Mayo's attorney was unquestionably competent. Mayo subsequently renewed his contentions in a Motion for New Trial, which the lower court again rejected without a hearing.

 On appeal Mayo argues that the lower court erred in not giving him an evidentiary hearing regarding the competence of his counsel. This argument might have merit if Mayo were able to show in the record any choices made by his counsel which were the product of inadequate preparation, or if Mayo could raise questions of fact in that regard. *United States v. DeCoster*, 487 F.2d 1197, 1201 (D.C. Cir. 1973). However, Mayo's allegations here are insufficient to require an evidentiary hearing. Mayo has not alleged how he was prejudiced by his trial counsel's behavior, and the alleged prejudice is not obvious. At present, Mayo's allegations amount to nothing more than a difference of opinion with respect to trial tactics. That alone generally does not constitute a denial of effective assistance of counsel. *See United States v. Kearney*, 560 F.2d 1358, 1368 (9th Cir.), *cert. denied*, 434 U.S. 971, 98 S.Ct. 522, 54 L.Ed.2d 460 (1977).[1]

## XI

## INSTRUCTION ON PROOF OF INTENT

 Appellants object to the trial court's giving of the following instruction on proof of intent:

> Intent ordinarily may not be proven directly, because there is no way of fathoming or scrutinizing the operations of the human mind. But you may infer the defendant's intent from the surrounding circumstances. You may consider any

statement made and done or omitted by the defendant, and all other facts and circumstances in evidence which indicate his state of mind.

> You may consider it reasonable to draw the inference and find that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted. As I have said, it is entirely up to you to decide what facts to find from the evidence.

An instruction of this sort was approved by this court in *United States v. Jenkins*, 567 F.2d 896, 897 (9th Cir. 1978). However, appellants contend that the Supreme Court's opinion in *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), decided several months after the jury reached its verdict in this case, requires us to hold that this instruction unconstitutionally shifts the burden of proof with regard to the element of intent.

*Sandstrom* is distinguishable. The jury instruction in *Sandstrom* stated that "the law *presumes* that a person intends the ordinary consequences of his voluntary acts." 442 U.S. at 513, 99 S.Ct. at 2453 (emphasis added). The Court reasoned that the jury could have interpreted the "presumption" referred to as conclusive, and determined that such an interpretation would have violated the due process requirement that the Government prove every element of a criminal offense beyond a reasonable doubt. 442 U.S. at 517–19, 99 S.Ct. at 2456–57. In so holding, the Supreme Court expressly distinguished the challenged instruction from an instruction of the kind given in this case, which does not tell the jury to presume intent from a voluntary act but merely permits the jury to infer intent. 442 U.S. at 514, 99 S.Ct. at 2454. Accordingly, *Sandstrom* does not bar the instruction given here.

## XII

## SELF–INCRIMINATION

 During jury deliberations, the court assembled the jurors for the purpose

---

1. Of course, nothing stated herein is intended to prejudice Mayo from raising these grounds again in a subsequent motion pursuant to 28 U.S.C. § 2255, provided a proper showing is made. *United States v. Lara-Hernandez*, 588 F.2d 272, 275 (9th Cir. 1978).

of sending them home for the evening. It was belatedly discovered that Dondich was not present. The following colloquy ensued:

> Lyons [Assistant United States Attorney]: No, we do not have Mr. Dondich present. Mr. White [co-counsel for Dondich] was checking to see where he is and I don't know what the answer is on that.
>
> Arian [counsel for Mayo]: I think that—
>
> White: Your Honor, I put in a telephone—
>
> The Court: Yes, sir?
>
> White: Excuse me, Your Honor. I put in a telephone call to Reality House[2] requesting Mr. Dondich to come to the court at once. He wasn't in at the time. By arrangement with Mr. Mayo I assume he is on his way.
>
> The Court: Is that correct, Mr. Mayo?
>
> Arian: I—oh, I'm sorry.
>
> Mayo: I imagine. He was calling me every 15 minutes. So if he wasn't—if I wasn't there, he's to come right here.
>
> The Court: I'm sorry, I under the impression that everyone was here. What we'll do, ladies and gentlemen, is wait a few minutes for Mr. Dondich so we'll let you go home early. And if he doesn't come I think I'll let you go home in any event. So why don't we wait just a few minutes for Mr. Dondich.

Mayo contends that this colloquy denied him his fifth amendment right to remain silent. He argues that he was forced under the circumstances to reveal information which tended to associate him with Dondich. He argues further that the colloquy denied him his fifth and sixth amendment rights to a fair trial because the reference to "Reality House" tended to show that Dondich was a prisoner, drug addict, or alcoholic, and prejudiced Mayo by associating him with Dondich.

Neither argument has merit. When Mayo answered the court's question without objection and in the presence of his counsel, he waived whatever fifth amendment privilege he had. Moreover, it is well estab-

lished that the privilege only protects against real dangers of incrimination, and not against remote and speculative possibilities. *Zicarelli v. New Jersey Commission of Investigation,* 406 U.S. 472, 478, 92 S.Ct. 1670, 1674, 32 L.Ed.2d 234 (1972). Mayo's answer did link him to Dondich, but there was overwhelming evidence already before the jury linking the two.

As to the "fair trial" argument, even if some jurors had heard of Reality House, the worst inference they could have drawn was that Dondich might have been in custody or had a drug or alcohol problem. In view of the evidence already introduced at trial, any prejudice to Mayo in being associated with someone who lived at Reality House was slight and the trial court's error in inadvertently eliciting this information was harmless.

AFFIRMED.

---

**2.** Reality House is a "halfway house" in San Francisco which houses alcohol and drug abus-

ers/addicts and federal prisoners.