**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Phillip TROUTMAN, Defendant-Appellant.**

No. 85–2028.

United States Court of Appeals, Tenth Circuit.

March 13, 1987.

William L. Lutz, U.S. Atty. (Mark D. Jarmie, Asst., with him on the brief), Albuquerque, N.M., for plaintiff/appellee.

Leon Taylor (Philip C. Gaddy, with him on the briefs), Albuquerque, N.M., for defendant/appellant.

Before BARRETT and SEYMOUR, Circuit Judges, and SAM, District Judge.*

SAM, District Judge.

Phillip E. Troutman appeals his conviction, following a jury trial in the United States District Court for the District of New Mexico, on conspiracy to commit extortion in violation of the Hobbs Act, 18 U.S.C. § 1951.[1] Troutman seeks reversal and remand on the ground the district court erred by refusing to grant his motion for a new trial, or in the alternative, for a judgment of acquittal. We affirm the conviction.

---

* Honorable David Sam, United States District Judge for the District of Utah, sitting by designation.

1. Troutman's co-defendant, Kenneth M. Johnson, does not appeal his identical conviction and sentence.

## I
### *Factual Background*

At the time of his arrest in December 1984, Troutman, the New Mexico State Investment Officer, managed and invested approximately three billion dollars in state funds. His codefendant, Kenneth Johnson, the New Mexico Deputy State Treasurer, paid out state monies and executed state investment transactions. They were advisors to, but not members of, the New Mexico Board of Finance.

In June, 1984, the Board of Finance received a resignation notice from the state fiscal agent, the Bank of Santa Fe. The fiscal agent is essentially the State's bank as it receives state deposits, honors state warrants, safeguards state instruments and acts as a clearing agent for the trading of state securities. It contracts the services of a separate financial institution, called the correspondent bank, that acts as the repository of state securities and oversees the delivery and receipt of securities being traded. Under New Mexico statute, a bank competing for the fiscal agent contract first selects its correspondent then submits a joint proposal to the Board of Finance.

Intending to bid for the fiscal agent contract, the First National Bank in Albuquerque (FNB) designated Irving Trust Company (ITC) as its correspondent in August, 1984. Bart Fleming, an ITC vice-president based in New York City, visited New Mexico on September 6–7, 1984 to discuss the details of the proposal. ITC later presented its portion of the proposal to FNB, and on September 12, 1984, FNB submitted the completed bid to the Board of Finance.

In late July or early August, 1984, the state Democratic fund-raiser, Tim Kraft, obtained New Mexico Governor Anaya's endorsement of a social function designed to secure contributions to the Democratic Leadership Fund which was distributed to Democratic legislative candidates throughout the state. Troutman and Johnson attended the meeting at which Kraft presented the fund-raising idea to the Governor and discussed the possibility of approach-ing for contributions the financial institutions represented at the Western States Treasurer's Conference hosted by the state a few weeks earlier.[2] Kraft believed Troutman and Johnson could solicit donations through their daily business interactions because they were acquainted with the bankers in the target institutions. Troutman later gave Kraft a list of people and companies doing business with the State.

On September 6, 1984, Bob Byers, manager of an ITC subsidiary, telephoned Johnson to discuss a new portfolio management system Byers had developed and desired to present to the governing body of the Western State Treasurers Association. Byers later sent Johnson an outline of the program and telephoned him on September 11 to discuss it. During that conversation, Johnson asked Byers whether his office had a political action committee or contributed to political fund-raisers. Byers replied his institution made no such contributions and declined Johnson's subsequent request that Byers contribute personally. Byers also stated he did not know whether the parent company, ITC, had a political action committee. Johnson responded that he was aware ITC was competing for some state business and that the contract for the correspondent bank was up for bid because the State's current correspondent, Citibank of New York, failed to purchase a sufficient number of tickets to the political fund-raiser hosted by Governor Anaya. Johnson then mentioned he would send some tickets should Byers decide to purchase them. A few days later, Byers received four $500 tickets to a Democratic political fund-raiser held in New Mexico, to which the following handwritten note was attached:

> Bob,
> Nice talking with you. I really don't mean to spring this on you (the tickets) until you mentioned Irving. I've heard good things about their custodial services and would like to see them considered by our Governor.

---

**2.** Johnson acted as a host official throughout the conference that was held in Santa Fe, New Mexico.

Take care,

Ken

R.I, 110–111. Byers did not commit ITC to a contribution, but he relayed to Johnson a message from Tom Archibald, a senior manager at ITC, that ITC saw no problem with purchasing the tickets.[3] Johnson then included ITC on the list of contributors he gave to Governor Anaya and Harvey Fruman, the state cash manager. Before the first Board of Finance meeting on September 27, 1984, Archibald informed Kraft he would not purchase the tickets. Archibald testified ITC refused the tickets because it considered that or any other contribution merely a means of buying business, a practice in which ITC did not engage. Johnson was extremely upset by ITC's decision not to contribute.

Archibald later discussed the tickets with Louis Whitlock, senior vice-president of Becker Industries Corp., a former transfer agent for ITC. Whitlock, then running for the state senate and otherwise participating actively in state Democratic politics, urged Archibald to make the donation, saying, "That's how business is done in New Mexico." Archibald responded ITC had a policy against making such contributions; however, he offered to put the tickets on his American Express card and read Whitlock the card number. Archibald claims he gave the card number because he tired under Whitlock's pressure and did not believe the card could be used for political contributions. Whitlock gave the card number to Kraft, but Johnson later refused to accept that form of contribution.

At the September 27, 1984 meeting of the Board of Finance, Troutman and Johnson urged the Board to delay approval of the correspondent contract until Johnson could examine ITC's computer software. The Board awarded the fiscal agent contract to FNB but rejected FNB's designation of ITC as its correspondent. Its rejection was unprecedented as the Board had always approved without comment the fiscal agent's choice for its correspondent.

On October 9, 1984, two weeks after the Board of Finance meeting, Johnson called Fleming into his office for a private conference and angrily remonstrated him for ITC's having "reneged" on its "commitment" to contribute to the Democratic leadership fund. R. III, 68. Johnson said all other applicants for the position of the correspondent bank had purchased tickets to the fund-raiser, and ITC's failure to cooperate "looked bad." *Id.* Fleming responded he had been advised ITC's purchase of the tickets would be illegal and ITC would not be willing to make the contribution.[4] Johnson then told Fleming to discuss the matter with Troutman because Troutman was "mad [ITC] had reneged." *Id.* The following day, Fleming met privately with Troutman in the office of the State Investment Council. After Troutman acknowledged he knew Fleming and was aware of the purpose of the visit, Fleming explained ITC was interested in the state business but refused to buy the tickets because it considered the purchase illegal. Although Troutman primarily listened and spoke very little at that meeting, he appeared completely apprised of ITC's situation and expressed neither surprise nor shock at Fleming's mention of the tickets.

Later that day, Fleming met Johnson for lunch during which Johnson again stressed that all other applicants for the correspondent contract had contributed to the fund and that, although he would like to see ITC secure the contract, he didn't know what he could do for it if ITC refused to purchase the tickets. Johnson also instructed Fleming not to inform FNB about the demands for contribution. Fleming testified he was shocked when he realized purchasing the tickets was essential to ITC's being considered for the correspondent bank contract.

Johnson telephoned Fleming on October 19, 1984 to say ITC could make the required $2,000 contribution by being designated, retroactively, as a sponsor of the

---

3. Byers testified he did not tell Archibald the information that Citibank's failure to purchase a sufficient number of fund-raiser tickets resulted in its loss of the correspondent bank contract.

4. At this meeting, Johnson proposed as another form of payment of the $2,000 that ITC underwrite Governor Anaya's travel expenses during his trips to New York City. Fleming said he would investigate that possibility.

1984 Western Treasurers Conference held the previous July. After Fleming received Johnson's documentation for the sponsorship, he telephoned Johnson and said ITC refused to make any contribution to the Conference. Johnson replied that things looked bad for ITC, that it really was not cooperating and that he didn't know what he could do for it.

On October 24, 1984, Troutman and Johnson met with Governor Anaya and recommended Citibank be awarded the contract because ITC refused to make the requisite contribution.[5] The following day, Fleming attended the second Board of Finance meeting and, at Johnson's request, met privately with Troutman. Troutman stated ITC's reneging twice on its commitments made it and Troutman look bad to Governor Anaya. He then proposed yet another vehicle by which ITC could contribute: by making a $2,000 contribution to a Mondale-Ferraro fund-raiser. At trial, Fleming characterized the suggestion as an "obvious shakedown." R. III, 91.

That evening, at Fleming's invitation, Troutman and Johnson dined with Fleming, Roy Ortman and Robert Lesko, ITC vice-presidents. When Lesko attempted to explain the services ITC could offer the State, Troutman rudely interrupted him by saying the quality of ITC's services would not be at issue as all New York banks are similar and the awarding of the contract would be based on the passing of funds, specifically $2,000. Troutman further emphasized he controlled the appointment of the correspondent. Johnson then stated, "You have to pay to play," and, "This is how business is done." R.I., 95–99; II, 15–20. The ITC officials repeatedly refused to make the required contribution stating they considered it illegal. Fleming testified Troutman turned away in disgust after being assured Ortman had final authority to make the decision.

The following day, October 26, ITC reported Troutman's and Johnson's solicitation efforts to FNB, and FNB relayed the information to the New Mexico Attorney General and the Federal Bureau of Investigation. As part of the ensuing investigation, FNB officers Ulibarri and Garcia agreed to record a lunch meeting with Johnson. In the taped conversation, Johnson recounted the history of Troutman's and his demands on ITC and explained his motive for urging the September delay in awarding the contract: that is, he was afraid Governor Anaya would be angry that Johnson had given him false information concerning ITC's commitment to buy the tickets, and Johnson wanted more time in which to persuade ITC to make the contribution.[6] Johnson also said he recommended ITC act retroactively as a sponsor of the Western States Treasurers Conference because he intended to "filter that two thousand dollars through Western Treasurers' account and cash it and take the cash down to [Speaker of the House] Ray Sanchez." Govt. Ex. A, 18. He sent ITC "falsified" documentation to facilitate the contribution. *Id.* Johnson admitted he realized his "laundering scheme" was "way off base," but he knew he could persuade

---

**5.** Troutman denies meeting with Fleming on October 10, 1984 and claims he first became involved with ITC's bid for the correspondent bank contract at the October 24, 1984 meeting with the Governor. He says he was concerned about the situation only because the rift between ITC and Johnson threatened to disrupt Troutman's office.

**6.** Following is the relevant portion of the taped conversation:

Johnson: [T]he Governor was perfectly willing to just get the whole thing done that day and to go ahead and go with Irving, but he was acting on information on that contribution that I supplied him.
Garcia: That wasn't now correct.
Johnson: That was not correct.

Garcia: Yeah.
Johnson: And that's why I made the bit spiel about not, never having examined Irving's software, because he would be very mad at me....
Ulibarri: Yeah, the programming was definitely not in place, was it?
Johnson: Yeah, right, right. I'da had to go out and come up with two thousand somewhere.
Garcia: (Laughing) Exactly, exactly.
Johnson: Now, I'm not sure how important that is, uh, you know, to [Governor] Anaya at that time, but I was covering my own ass because I had given him information that turned out to be incorrect.
Government Exhibit 8, p. 16.

Troutman to support ITC only if it contributed to the fund because Troutman was extremely agitated by ITC's intransigence. Finally, Johnson revealed he admonished Fleming not to inform FNB of Troutman's and his demands for contribution because, if discovered, he could spend "two years in Stanford [sic] on a bribe charge." *Id.* at 22.

The Board of Finance approved the joint proposal for FNB as its fiscal agent and ITC as the correspondent bank on November 8, 1984. Troutman claims he verbally recommended ITC, but Johnson said nothing at the meeting. The Government asserts ITC received the contract after refusing to contribute only because the FNB bid was to expire three days later and the existing fiscal agent had already tendered its resignation effective November 15, 1984. Apparently, the State wanted to work with FNB, and FNB had not chosen another correspondent.

On November 9, 1984, Paul G. Bardacke, New Mexico Attorney General, and Stephen Westheimer, Deputy Attorney General, were approved to act as Special Assistant United Stated Attorneys for prosecution of criminal charges against Troutman and Johnson, pursuant to 28 U.S.C. § 543(a).[7] They appeared with members of the United States Attorney's Office on behalf of the United States during the grand jury's inquiry, at the motions hearing and at trial. The Government presented the case to the grand jury on November 13 and 14, 1984, and Troutman and Johnson were arrested on December 4, 1984. The grand jury reconvened on December 9, 1984 and

issued an indictment charging both with conspiring to commit extortion in violation of the Hobbs Act, 18 U.S.C. § 1951.[8] On May 14, 1985, Troutman and Johnson were convicted by jury. The district court fined them $5,000 each and sentenced them to two years imprisonment. Troutman appeals from the court's denial of his motion for a new trial or, in the alternative, for judgment of acquittal.

## II

### *Appellate Contentions*

On appeal, Troutman contends the trial court erred by: (1) refusing to disqualify as prosecutor the New Mexico Attorney General; (2) refusing to dismiss the indictment for improprieties in the grand jury proceedings; (3) denying Troutman's Motion for severance and admitting statements made by Johnson; (4) admitting statements made by Mike Anaya; (5) submitting separate verdict forms; (6) mentioning other coconspirators while instructing the jury; (7) denying Troutman's requested jury instruction concerning the lawfulness of awarding state contracts on the basis of political affiliation; (8) precluding effective assistance of counsel to Troutman by withholding grand jury minutes and denying his motion to interview or depose various government witnesses; (9) excluding evidence of Troutman's state business with other entities not related to the instant action; and (10) denying Troutman's motion for a directed judgment of acquittal or, alternatively, for a new trial. Troutman

---

7. Section 543(a) states: "The Attorney General may appoint attorneys to assist United States attorneys when the public interest so requires."

8. Section 1951, 18 U.S.C. provides, in relevant part:
 (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.
 (b) As used in this section—

 ....
 (2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.
 (3) The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside the State; and all other commerce over which the United States has jurisdiction.

also asserts the cumulative error deprived him of a fair trial.

### A. *Disqualification as prosecutors of the New Mexico Attorney General's Office*

Troutman first argues that because the Attorney General has a statutory duty to represent state officials, the participation by Attorney General Bardacke and Deputy Attorney General Westheimer in the prosecution created a conflict of interest in derogation of Canon 4 of both the New Mexico Code of Professional Responsibility and the American Bar Association Code of Professional Responsibility (ABA Code) or, at minimum, the appearance of impropriety in violation of Canon 9 of the ABA Code. Troutman further asserts Bardacke should have disqualified himself because he knew or should have known he was a material witness to facts upon which the indictment was based.

### 1. Conflict of interest

Troutman contends the district court erred by denying his motion to disqualify the Attorney General under the Canon 4 provision that an attorney should preserve the confidences and secrets of a client. He argues he enjoyed an attorney/client relationship with the Attorney General because the Attorney General represented him in his daily business affairs until the time of his arrest and because Troutman was acting in his official capacity while attempting to determine whether ITC could be trusted as a correspondent. At trial, Troutman offered no corroborative evidence of the claim his overtures toward ITC were part of his official duties as State Investment Officer. He set forth nothing more than his continual assertion he was simply preserving the "smooth operation of his office" and testing ITC's integrity by determining whether it would keep its commitments. In Troutman's words, "if [ITC] would not honor a minor, inconsequential and lawful obligation to purchase tickets, how could it be trusted to handle multimillion dollar transactions?" Troutman's reply brief at 4. As further support for his assertion the Attorney General breached its attorney/client relationship with him,

Troutman claims he consulted with and received advice from the Attorney General concerning the subject fiscal agent contract. At trial, he testified he thought about calling the Attorney General immediately after his arrest but decided against it when he discovered Ed Staffel represented the Attorney General during the questioning. Troutman said he felt somewhat relieved by Staffel's presence and would have called other counsel had Staffel not appeared.

The Government responds that the Attorney General has a statutorily defined duty to represent state officers and employees in actions brought against them in their official capacities. N.M.Stat.Ann. § 8–5–2(C) (1978 Comp.). Troutman's extortion attempts lay outside the ambit of his official duties, and he was not entitled to representation by the Attorney General. Moreover, the Attorney General acted properly in assisting in the prosecution of this official misconduct because he also has an affirmative, statutorily defined duty to prosecute all criminal actions when, in his judgment, it is in the best interest of the state to do so. N.M.Stat.Ann. § 8–5–2(B) (1978 Comp.).

After a lengthy hearing on the disqualification issue, the district court ruled Bardacke's acting as prosecutor created no *inherent* conflict of interest because the New Mexico statute requires the Attorney General to defend actions against a state officer only when the cause of action arises while the officer is acting in his official capacity. The court held the acts alleged in the indictment were unlawful personal acts not encompassed by Troutman's official duties. It further concluded no inherent conflict of interest existed merely because the Attorney General had advised Troutman, in Troutman's official capacity as the State Investment Officer, on matters unrelated to the offenses charged.

Finding no inherent conflict of interest, the district court turned to the question of whether the evidence showed an *actual* conflict of interest that would arise only if an actual attorney/client relationship, involving the criminal acts charged, existed between Troutman and the Attorney Gen-

eral. For the following reasons, the court specifically held no actual conflict arose:

In this case, there has been no showing of any communication between either defendant and the Attorney General's Office concerning acts giving rise to this indictment. Defendants have not alleged that they discussed with the Attorney General the soliciting of campaign funds, nor contacts they may have had with the Irving Trust Company or their businesses being considered for a state contract. They have not alleged that they sought legal advice about such matters from the Attorney General, either personally or officially. Defendants have not shown that, in the course of serving as legal advisor to the state agencies, the Attorney General acquired knowledge about these matters from some other source. In sum, there is simply no evidence that the Attorney General acquired any confidential information or provided any legal advice or representation to the defendants regarding the acts with which defendants are charged.

Memorandum Opinion and Order, entered March 22, 1985, at 7.

Troutman does not dispute the substance of that ruling; he argues an actual conflict of interest existed because through the Attorney General's representation of Troutman and other state officials involved in the selection of the correspondent, Bardacke became privy to facts closely interwoven with the criminal prosecution, although admittedly not to facts upon which the extortion charges were actually based.

■ We are persuaded the district court's ruling that no actual conflict of interest existed should not be disturbed, and adopt the supporting rationale. We further note that although Troutman couches his contention in terms of actual conflict of interest, the main of his argument goes to the inherent conflict of interest he perceives to arise when a state attorney general prosecutes a state officer for actions taken in his official capacity. Therefore, the threshold question is whether Troutman was acting in his official capacity during his dealings with ITC.

Throughout the motion hearings and trial, Troutman maintained the defense posture that he was merely testing ITC's integrity and the $2,000 meant nothing to him. The jury had ample exposure to that view and rejected it. The district court also rejected Troutman's story as shown in the clear language of its denial of Troutman's motion for a new trial or judgment of acquittal. We agree with the district court that Troutman acted outside his official duties while engaged in the acts for which he was charged. To accept Troutman's account would be to exalt his subjective claims over objective evidence of the "pay-to-play" message that permeated his actions toward and communications with ITC.

■ We also agree with the district court, for reasons set out in the authority cited by the Government, that an inherent conflict of interest does not arise merely because a state attorney general prosecutes a state officer whom he formerly represented. *People v. Downen,* 119 Ill. App.3d 29, 74 Ill.Dec. 784, 456 N.E.2d 286 (1983) (No conflict of interest arose from a state attorney general's conducting a grand jury investigation into alleged state election irregularities); *Ward v. Superior Court,* 70 Cal.App.3d 23, 138 Cal.Rptr. 532 (1977) (Court denied motion of plaintiff, county assessor, to disqualify county attorney as defense counsel from assessor's civil rights suit and rejected assessor's claim he enjoyed an attorney/client relationship with the county attorney when the county attorney had never represented him in any action outside his public duties); *State ex rel. Dunbar v. State Board of Equalization,* 140 Wash. 433, 249 P. 996 (1926) (No inherent conflict arises from prosecution by the state attorney general of public employees charged with misuse of public funds); *see also, Meehan v. Hopps,* 144 Cal.App.2d 284, 301 P.2d 10 (1956). The common thrust of the Government's authority is that a state attorney general has a primary responsibility to protect the interests of the people of the state and must be free to prosecute violations of those interests by a state officer regardless of his representation of the state officer in past or pending litigation.[9]

**9.** Troutman contends the Attorney General's presence was unnecessary because the court

We are not moved from our conclusion by the authority on which Troutman relies. The facts in *People ex rel. Deukmejian v. Brown*, 29 Cal.3d 150, 172 Cal.Rptr. 478, 624 P.2d 1206 (1981) are readily distinguishable from the instant facts in that the Attorney General in *Brown* instituted a lawsuit against the State Personnel Board challenging the constitutionality of an employee relations statute, an issue on which the Board acted against the Attorney General's extensive advice. The Attorney General filed a mandamus action against the Board, the Governor and other state officers and agencies to compel them to ignore the employee relations statute because of its claimed conflict with the state constitution. Holding the Attorney General had a conflict of interest, the California Supreme Court enjoined him from proceeding and dismissed the case. Unlike the *Brown* defendants, Troutman never communicated with the Attorney General concerning his efforts to solicit political contributions from ITC. Furthermore, the State Personnel Board's action in *Brown* involved a bona fide administrative decision; Troutman's alleged activities are criminal in nature and cannot be characterized as involving policy matters lying within the scope of his official position.

Troutman also cites *Corbin v. Broadman*, 6 Ariz.App. 436, 433 P.2d 289 (1968), a case concerning an actual conflict of interest resulting from the appointment of a prosecutor who previously practiced law in the office of one defendant and worked on matters for the remaining defendants. While so employed, he became privy to some of the facts on which the indictment was based. *Corbin* is inapposite to this case because the Attorney General had no knowledge of the facts essential to Troutman's indictment and an attorney/client relationship never existed between the Attorney General and Troutman in his individual capacity.

Accordingly, the district court did not err by refusing to disqualify Bardacke and Westheimer as Special Assistant United States Attorneys in this action.

2. The Attorney General as a material defense witness

Troutman asserts that where he intended to call Bardacke and his staff as witnesses, the district court incorrectly denied Troutman's motion to disqualify the Attorney General as prosecutor. He claims Bardacke was in the best position to explain that the selection of the correspondent was delayed on September 27, 1984 because the Attorney General had not yet drafted an acceptable indemnification clause for the correspondent contract. Troutman further contends Bardacke could have testified the Attorney General issued the opinion that the State had authority to divide the fiscal agent and correspondent contracts and was not bound by statute to accept the fiscal agent's choice for a correspondent bank. Finally, Troutman maintains Bardacke could have explained the November 8, 1984 deadline was not the final cut-off date for the selection of the fiscal agent because the current agent agreed to continue under its contract until a new one was selected.

■ The district court has absolute discretion to permit a defendant to call the prosecutor as a witness and may deny the request if it does not appear the prosecutor "possesses information vital to the de-

---

could have appointed a special prosecutor or required the United States Attorneys to go forward unassisted by Bardacke and Westheimer. We are neither inclined to examine the availability of alternative prosecution teams nor second-guess the Government's reasons for proceeding as it did. Rather, we confine our review to the propriety of the appointment of the Attorney General and his Deputy as Special United States Assistants in the present case. However, we observe that preclusion of the Attorney General from the prosecution of every case of malfeasance by state officers merely on an attenuated claim the officer acted in his official capacity would violate the intent of the statutes requiring the Attorney General to protect the public interest and would create undue burdens of time and expense for the State. As *Downen* noted, "To disqualify the State's Attorney from conducting such an investigation would 'require the appointment of a special prosecutor in every investigation of official misconduct involving county officials.'" *Downen*, 74 Ill.Dec. at 786, 456 N.E.2d at 288 (quoting *In re Grand Jury Investigation of Swan*, 92 Ill. App.3d 856, 48 Ill.Dec. 70, 415 N.E.2d 1354, 1360 (Ill.App.1981)).

fense." *Gajewski v. United States*, 321 F.2d 261, 268–69 (8th Cir.1963). Here, the district court denied Troutman's motion to disqualify Bardacke and Westheimer after its review of the parties' extensive briefs and a full day of oral argument dedicated solely to that issue. The court reasoned, as follows, that the testimony of Bardacke and other members of his staff was not vital to the defense and could be obtained through other witnesses:

The record indicates that the Attorney's General's actions and recommendations in regard to the awarding of the contract were made in the course of public meetings and in widely-circulated correspondence. A number of potential witnesses exist who possess knowledge concerning the actions and recommendations of the Attorney General regarding the awarding of this contract. The defendants are aware of these witnesses. Indeed, the defendants attached to their memorandum in support of this motion a number of official letters between the Attorney General's office and various state agencies and officials concerning the awarding of the contract and the timing thereof. There is no indication that the Attorney General's office took any actions that potentially affected the timing of the award other than the essentially public statements and recommendations about which numerous persons have knowledge. Any evidence as to the effect that the Attorney General may have had on the timing of the award can be introduced through the testimony of a number of witnesses other than members of the Attorney General's office. Indeed, as the Attorney General apparently was not a voting member of the Board of Finance, his role in the timing of the award appears to have been merely advisory. Other persons, directly involved in the awarding of the contract, would appear to be more appropriate witnesses as to why the award of the contract proceeded as it did.

Memorandum Opinion and Order at 10–11. The trial record justifies the court's determination as Troutman called four of the five members of the Board of Finance who attended the September 27, 1984 meeting, voted on the delay in the award of the correspondent contract and thus, were qualified to testify concerning the reason ITC was not approved at that time. Several other witnesses testified to whether FNB had the right to select its own bank and whether the existing correspondent could work with FNB. Upon review of the exhaustive testimony and documentary evidence admitted on these issues, we are convinced that not only would Bardacke's testimony have been cumulative but other witnesses were more knowledgeable than he about key occurrences.

The district court properly denied Troutman's motion to disqualify the Attorney General because the testimony of Bardacke and his staff was not vital to Troutman's defense.

3. Bardacke's alleged violation of Disciplinary Rule 5–102(B)

■ Troutman asserts Bardacke violated DR 5–102(B) of the ABA Code by proceeding as the prosecutor when he knew or should have known he would be called as a defense witness. Subsection (B) states:

If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm may be called as a witness other than on behalf of his client, he may continue the representation until it is apparent that his testimony is or may be prejudicial to his client.

As set out in our discussion of his motion to disqualify, Troutman considers Bardacke's testimony necessary evidence on certain questions, primarily those regarding delays in and deadlines for the contract award. Troutman points out the grand jury asked about the reasons for the delays and contends these questions are central to determination of his guilt or innocence under the extortion charge. Therefore, testimony that the actions of Johnson and Troutman were not the sole cause of the delay or that the Board of Finance was not forced to approve FNB and ITC before an immutable deadline constitutes exculpatory material that should have been available to Troutman under *Brady v. Maryland*, 373

U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1985), but was denied him by Bardacke's failure to recuse.

We agree with the district court's pre-trial ruling that Bardacke and his staff were not material witnesses in this case and its determination that DR 5–102(B) does not apply here. Consequently, we find no point before or during trial at which it should have been obvious Bardacke or a member of his staff should be called as a witness.

First, we reject Troutman's framing of the pivotal legal questions in this action. Under the Hobbs Act, the Government does not have the burden to show Troutman actually controlled the award of the fiscal agent contract; rather, it is required to show the reasonableness of ITC's belief, after being subjected to Troutman's actions and communications, that Troutman could affect the award. *United States v. Rabbitt,* 583 F.2d 1014, 1027 (8th Cir.1978); *United States v. Hathaway,* 534 F.2d 386, 394 (1st Cir.1976); *United States v. Mazzei,* 521 F.2d 639, 645 (3d Cir.1975) (The Court of Appeals upheld a Hobbs Act conviction where payments to the defendant state senator were induced by the victim's reasonable belief the senator controlled the award of state leases, but, as a matter of law, he lacked authority to approve them).

Second, Bardacke neither received nor conveyed information concerning Troutman's attempts to convince ITC its consideration as a correspondent was conditioned on its willingness to make the $2,000 political contribution. Therefore, Bardacke's testimony concerning delays and deadlines would not have reached questions material to Troutman's guilt or innocence. For that same reason, the immateriality of Bardacke's knowledge of the crucial events of this case, his testimony is not *Brady* material, and Bardacke's failure to testify did not abridge Troutman's constitutional right to a fair trial.

Third, the mere fact the grand jury inquired about the delay did not necessitate Bardacke's withdrawal. As the Government points out, "[t]he scope of a grand jury's investigation is 'necessarily broad if its public responsibility is to be adequately discharged.'" Government's brief at 29 (quoting *Branzburg v. Hayes,* 408 U.S. 665, 700, 92 S.Ct. 2646, 2666, 33 L.Ed.2d 626 (1972)); *Costello v. United States,* 350 U.S. 359, 364, 76 S.Ct. 406, 409, 100 L.Ed. 397 (1956). The breadth of the grand jury inquiry has no bearing on the Government's burden at trial, and nothing that occurred during those proceedings indicates Bardacke should have known he would be called as a defense witness. Moreover, we note the primary purpose of DR 5–102(B) is to prevent an attorney from prejudicing his client by taking the witness stand, a scenario that does not arise here.

4. The appearance of impropriety regarding Bardacke's role as prosecutor

■ Troutman relies completely on a Sixth Circuit decision, *In Re Grand Jury Subpoenas,* as authority for his argument that Bardacke's participation in the prosecution created the appearance of impropriety in violation of Canon 9 of the ABA Code. 573 F.2d 936 (6th Cir.1978), *cert. denied,* 440 U.S. 934, 99 S.Ct. 1277, 59 L.Ed.2d 492 (1979). That Court terminated the grand jury proceedings because the participation of an Internal Revenue Service attorney who conducted a civil audit on the defendant and later recommended his criminal prosecution created the impression of partiality and cast a shadow over the integrity of his office. Troutman admits later cases hold that an agency attorney who investigated a matter civilly may also appear as a prosecutor before the grand jury, *see, e.g., United States v. Birdman,* 602 F.2d 547 (3d Cir.1979) (Securities Exchange Commission Attorney); *In re Perlin,* 589 F.2d 260 (7th Cir.1978) (Commodity Futures Trading Commission Attorney); *United States v. Dondich,* 460 F.Supp. 849 (N.D.Cal.1978) (S.E.C. Attorney); however, he claims Bardacke did more than merely investigate the case, and Bardacke's presence in the grand jury proceedings and at trial created the feeling of partiality discussed in *Grand Jury Subpoenas.*

We do not believe Bardacke's limited participation in the legitimate aspects of selecting the correspondent approaches the level of a formal investigation, and there-

fore, reject application of Troutman's authority to these facts. That the formal investigation of the extortion charges began two weeks before the fiscal agent contract was awarded is insignificant, because Troutman did not communicate with the Attorney General before or during the investigation concerning his attempts to solicit a $2,000 contribution from ITC.

Canon 9 of the ABA Code states, "A lawyer should avoid even the appearance of professional impropriety." The general language of Canon 9 cannot be construed as a failsafe for a claim of ethical violation where none is found under the specific canons or disciplinary rules applicable to the case at bar.[10] Although courts have not foreclosed the possibility of disqualification under Canon 9 alone, *see, e.g., Optyl Eyewear Fashion International v. Style Cos.,* 760 F.2d 1045, 1049 (9th Cir.1985) (Canon 9 alone sufficient basis for disqualification of alleged impropriety clear, affects public view of judicial system or court integrity and is serious enough to outweigh parties' interest); *Norton v. Tallahassee Memorial Hospital,* 689 F.2d 938 (11th Cir. 1982); *United States v. Smith,* 653 F.2d 126 (4th Cir.1981); *Sierra Vista Hospital, Inc. v. United States,* 639 F.2d 749, 754, 226 Ct.Cl. 223 (1981) (such disqualification appropriate in clear, compelling case), they are reluctant to disqualify a lawyer under Canon 9 when none of Canons 1 through 8 were violated. *Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.,* 518 F.2d 751, 757 (2d Cir.1975) ("Canon 9 is not intended completely to override the delicate balance created by Canon 4 and the decisions thereunder."); *International Electronics Corp. v. Flanzer,* 527 F.2d 1288, 1295 (2d Cir.1975) ("Canon 9 ... should not be used promiscuously as a convenient tool

for disqualification when the facts simply do not fit within the rubric of other specific ethical and disciplinary rules"); *see also, Gas-a-tron of Arizona v. Union Oil Company,* 534 F.2d 1322, 1324–25 (9th Cir. 1976); *Schmidt v. Pine Lawn Memorial Park, Inc.,* 86 S.D. 501, 198 N.W.2d 496, 502–03 (1972); *Meyerhofer v. Empire Fire and Maine Ins. Co.,* 497 F.2d 1190, 1195–96 (2d Cir.), *cert. denied,* 419 U.S. 998, 95 S.Ct. 314, 42 L.Ed.2d 272 (1974). Here, we see no compelling reason to review the question under Canon 9 and its interpretative caselaw where Canons 4 and 5 do not preclude Bardacke's participation in the prosecution.

We conclude Bardacke violated no ethical canon by prosecuting Troutman.

**B.** *The district court's refusal to dismiss the indictment*

Troutman moved to dismiss the indictment on the following grounds: 1) the presence before the grand jury of unauthorized persons, Bardacke and Westheimer, violated Fed.R.Crim.P. 6(d);[11] 2) Bardacke's and Westheimer's participation constituted prosecutorial misconduct that deprived Troutman of due process of law; 3) Bardacke and Westheimer were never administered the oath of office as Assistant United States Attorneys; and 4) prejudicial pre-trial publicity and improper comments during the proceedings tainted the grand jury.

**1.** Bardacke's and Westheimer's presence in the grand jury room

Troutman first contends that upon our holding the Attorney General's participation in this case created a conflict of interest or the appearance of impropriety,

---

**10.** In his article, "The Appearance of Impropriety Under Canon 9: A Study of Federal Judicial Process Applied to Lawyers," Professor Kramer points out that where Canons 4 and 5 apply, Canon 9 should not be resorted to. 65 Minn.L. Rev. 243 (1980). He reasons:

> [R]esort to the vagueness of Canon 9 is altogether unnecessary when Canons 4 and 5 directly apply. Several courts have decided 'concurrent adverse representation' cases on the bases of Canons 4 and 5 without relying on Canon 9. Moreover, the drafters of Canon 9 did not intend for the Canon to be applied

when any of the first eight Canons are controlling.

*Id.* at 31.

**11.** Fed.R.Crim.P. 6(d) states:

> Attorneys for the government, the witness under examination, interpreters when needed and, for the purpose of taking the evidence, a stenographer or operator of a recording device may be present while the grand jury is in session, but no person other than the jurors may be present while the grand jury is deliberating or voting.

we should also hold Bardacke and Westheimer were *per se* unauthorized persons in the grand jury room. *See Corbin,* 433 P.2d at 951; *United States v. Gold,* 470 F.Supp. 1336, 1346 (N.D.Ill.1979); *United States v. Phillips Petroleum Co.,* 435 F.Supp. 610, 618 (N.D.Okla.1077).

As stated above, we find the Attorney General's role as prosecutor neither created a conflict of interest nor the appearance of impropriety; therefore, the presence of Bardacke and Westheimer in the grand jury room was not unauthorized.

■ Troutman further contends that Bardacke placed his credibility in dispute by testifying in answer to a grand juror's question asked during Fruman's testimony. The juror said, "I would like to ask Mr. Bardacke, who is on the—who's on the PERA [Public Employees Retirement Association] Board." Bardacke responded briefly by explaining his recollection of the New Mexico statute governing Board membership. Troutman claims Bardacke's response is significant testimony because Fruman had earlier testified that the PERA Board also requested a delay on September 27, 1984 and that he did not know who influenced the PERA.

This issue was briefed and argued to the district court, upon which the court ruled:

> The matter about which [Bardacke] spoke reasonably can be characterized as an insubstantial arguably uncontested matter. Indeed, the composition of the PERA Board is governed by statute, *see* N.M.S.A. 10–11–4(B), and a government attorney may advise the grand jury on applicable statutes. *United States v. Singer,* 660 F.2d 1295 (8th Cir.1981). Bardacke's brief exchange with the grand juror was an isolated incident, concerning a matter of formality rather than a matter substantively material to the indictment. Under all the circumstances, the Court does not find that Bardacke was an unsworn witness before the grand jury in violation of Rule 6.

Memorandum Opinion and Order at 14. The transcript of the grand jury proceed-

ings was not admitted at trial [12] and not designated as part of the record on appeal. However, we note Troutman's recitation of the events of the proceedings echoes that set forth by the Government and comports with the district court's findings and conclusions, and see no reason to disturb the court's decision.

Troutman further asserts Bardacke testified before the grand jury through his questioning of witnesses. Again, absent the transcript of the proceedings, we must defer to the district court's conclusion, reached after its review of the entire transcript, that Bardacke's conduct before the grand jury was proper at all times.

2. Administration of the oath of office as Assistant United States Attorneys to Bardacke and Westheimer

■ Before trial, Troutman moved to dismiss the indictment on the ground that Bardacke and Westheimer were improperly sworn as Assistant United States Attorneys when they appeared before the grand jury because Bardacke and Westheimer failed to raise their hands and read aloud their oaths. Instead, both signed an Appointment Affidavit before a notary public in which each averred, "I will faithfully discharge the duties of the office on which I am about to enter. So help me God." The district court denied the motion stating that Troutman's argument artificially exalted form over substance.

The Government cites extensive authority in support of the proposition that

> [n]o particular formalities are required for there to be a valid oath. It is sufficient that, in the presence of a person authorized to administer an oath ... the affiant by an unequivocal act consciously takes on himself the obligation of an oath....

*United States v. Yoshida,* 727 F.2d 822, 823 (9th Cir.1983). *See, e.g., Plauche-Locke Securities, Inc. v. Johnson,* 187 So.2d 178, 181 (La.App.1966). The upholding of the right hand is not necessary. *State v. Parker,* 81 Idaho 51, 336 P.2d 318,

---

**12.** Transcripts of Fruman's and Chavez' testimonies before the grand jury were produced for the motions hearing on these issues.

321 (1959); *In re Rice,* 35 Ill.App.2d 79, 181 N.E.2d 742 (1962); *Plauche-Locke,* 187 So.2d at 181.

Where Bardacke and Westheimer executed properly notarized affidavits that reflected nearly verbatim the words of the spoken oath, we find they took unequivocal acts in assuming their responsibilities as Special Assistant United States Attorneys and did so without reservation in the presence of an officer duly authorized to administer oaths and in accordance with state law. N.M.Stat.Ann. § 14–12–2 (1978 Comp.). Neither Bardacke nor Westheimer was an unauthorized person before the grand jury, and the district court properly denied Troutman's motion to dismiss the indictment on that claim.

### 3. Pre-trial publicity

The issue of prejudicial pre-trial publicity was initially discussed in Troutman's motion for a change of venue. The district court heard extensive testimony on the motion and concluded, "The publicity attending this case can be characterized as consisting generally of factual reporting of court proceedings and pleadings. The evidence does not indicate the existence of highly sensational or accusatory publicity." Memorandum Opinion and Order, filed March 26, 1985, at 2.

█ Troutman raises for the first time on appeal his argument that the pre-trial publicity violated DR 7–107(B)(6)[13] of the ABA Code and Rule 35 for the District of New Mexico, and poisoned the grand jury's ability to render a true bill. His failure to raise the issue of prejudice to the grand jury with the district court precludes its review except for the "most manifest error." *Gundy v. United States,* 728 F.2d

484, 488 (10th Cir.1984). We find no manifest error resulted from the district court's allowing the case to proceed on the indictment.

█ Troutman terms prejudicial and inflammatory the statement made by United States Attorney Lutz after Troutman's arrest but before his indictment and quoted in the *Albuquerque Journal* : "We're only in the early stages [of the corruption investigation]. It's been our experience with cases of political corruption that they often take a long time.... People lie. That isn't to say that is what's happened here." Troutman's Exhibit C, Motions. Troutman admits that nothing indicates any member of the grand jury actually read the article in which the statement appeared;[14] he merely points to two incidents occurring during the grand jury proceedings that "seem to bear out this exposure." Troutman's brief at 15. First, the grand jury indicted Mike Anaya on charges of perjury then dismissed the charges when he later confessed his testimony was incorrect and he intended to mislead the jury. Second, a grand juror said to Fruman, "I have a question; I hope you will give me an honest answer."

█ We consider Lutz' brief press statement a general comment on the complexity of cases involving charges against public officials, not a specific comment on the strengths of the present case or Troutman's guilt or innocence. Therefore, Lutz did not violate DR 7–107(B)(6). Concerning the alleged prejudice to the grand jurors, we view as attenuated at best Troutman's argument the two isolated occurrences during the grand jury proceedings show the grand jurors were tainted by Lutz' statement. Troutman offers no explanation of

---

**13.** DR 7–107(B)(6) states:

A lawyer or a law firm associated with the prosecution or defense of a criminal matter shall not, from the time of the filing of a complaint, information, or indictment, the issuance of an arrest warrant, or arrest until the commencement of the trial or disposition without trial, make or participate in making an extra-judicial statement that a reasonable person would expect to be disseminated by means of public communication and that relates to:

. . . .

(6) any opinion as to the guilt or innocence of the accused, the evidence, or the merits of the case.

**14.** In a survey conducted by Troutman, 16% of the respondents said they believed Johnson and he were guilty before the surveyor read them Lutz' press statement. After hearing the statement, 36% of the respondents "were predisposed towards guilt." Troutman's brief at 15. Troutman claims "more dramatic results were observed in various groups in the survey pool." *Id.*

how the indictment for perjury of Mike Anaya relates to grand jury prejudice. Regarding the grand juror's simple request for a straightforward answer from Mr. Fruman, Troutman asserts, "Clearly, the Juror was skeptical as to the honesty of Mr. Fruman and may have been so because of exposure to Mr. Lutz' statement." Troutman's brief at 16. We are not so convinced. The district court termed Fruman's testimony at trial as "equivocal," and nothing indicates his testimony before the grand jury was more precise. Memorandum Opinion and Order at 14. The grand juror's comment could have been prompted as easily by Fruman's demeanor during the proceedings as by any extra-judicial statement. Dismissal of an indictment is an extraordinary remedy, and we are not inclined to grant it on mere conjecture unsupported by evidence. *United States v. Pino,* 708 F.2d 523 (10th Cir. 1983).

### C. *Denial of access to the grand jury minutes*

■■■ Troutman asserts the district court erred by denying full disclosure of the grand jury minutes before trial.[15] He recognizes the Government is not obligated to furnish transcripts of the grand jury proceedings before the various witnesses have testified on direct, *United States v. Gant,* 487 F.2d 30 (10th Cir.), *cert. denied,* 416 U.S. 941, 94 S.Ct. 1946, 40 L.Ed.2d 293 (1973), and will be ordered to do so only in rare "cases of particularized need where the secrecy of the [grand jury] proceedings is lifted discretely and limitedly." *United States v. Procter & Gamble Co.,* 356 U.S. 677, 683, 78 S.Ct. 983, 986, 2 L.Ed.2d 1077 (1958). Troutman argues the requisite "particularized need" is present because Lutz made two improper comments during his examination of witnesses before the grand jury: the first likened Fruman's early disclosure of Governor Anaya's preference for the fiscal agent to the grand jury's violating its shroud of secrecy, and the second implied the Attorney General's Office had advised the State for a year that the current fiscal agent's added responsibilities were illegal.

After examining the entire transcript of the grand jury proceedings, the district court stated, "[t]he transcript' simply does not evidence actions by the prosecutors of infringing upon the independence of the grand jury. No prosecutor testified before the grand jury. None exhibited undue prejudice toward the defendants, badgered witnesses, nor acted in a way that could be characterized as prosecutorial over-reaching." Memorandum and Opinion Order at 16.

Troutman's request for the grand jury minutes is governed by the Jencks Act, 18 U.S.C. § 3500.[16] Under the requirements

---

15. The court released portions of the transcript containing Fruman's testimony and one other not relevant to this appeal after direct examination of those witnesses at trial.

16. 18 U.S.C. § 3500 states, in relevant part:

(a) In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

(b) After a witness called by the United States has testified on direct examination the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness had testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

(c) If the United States claims that any statement ordered to be produced under this section contains matter which does not relate to the subject matter of the testimony of the witness, the court shall order the United States to deliver such statement for the inspection of the court in camera. Upon such delivery the court shall excise the portions of such statement which do not relate to the subject matter of the testimony of the witness. With such material excised, the court shall then direct delivery of such statement to the defendant for his use. If, pursuant to such procedure, any portion of such statement is withheld from the defendant and the defendant objects to such withholding, and the trial is continued to an adjudication of the guilt of the defendant, the entire text of such statement shall be preserved by the United States and, in the event the defendant appeals, shall be made available to the appellate court for the purpose of determining the correctness of

of the Act, the district court properly conducted an *in camera* inspection resulting in its ruling that Troutman's claims of prosecutorial conduct were groundless and did not show a particularized need sufficient to warrant early release of the grand jury transcripts.

We further note the provisions of 18 U.S.C. § 3500(c), concerning preservation for appellate review the court's denial of full disclosure, relate to statements withheld from a defendant *after* the witness at issue has testified on direct and then apply only upon the defendant's timely objection to the withholding. No such objection appears in the record, and we see no manifest error in the district court's refusal to order the release of the entire grand jury proceedings either before trial or after the direct examination of witnesses during trial.

D. *Denial of severance of trials and admission of Johnson's statements*

Troutman moved for severance pursuant to Fed.R.Crim.P. 14,[17] on two grounds: 1) admissions of Johnson's statements would prejudice Troutman because Johnson made several incriminating statements outside the scope and not in furtherance of the alleged conspiracy; and 2) the jury would be unable to "compartmentalize" the evidence and apply it to Troutman or Johnson according to his individual level of involvement.

At trial, Troutman raised a continuing objection to admission of Johnson's statements on the ground they were hearsay

because no conspiracy had first been established by evidence independent of the co-conspirator's statements. *United States v. Petersen,* 611 F.2d 1313 (10th Cir.1979); *United States v. Andrews,* 585 F.2d 961 (10th Cir.1978). On appeal he asserts the evidence linking Troutman to the conspiracy was so weak his conviction indicated jury confusion that could have been avoided had the trials been severed.

The Government responds the district court's denial of severance comports with well-established legal principles governing conspiracy cases and is proper considering the present facts. The indictment charged Troutman with conspiracy to commit extortion under 18 U.S.C. § 1951. The essence of the crime of conspiracy is an agreement to violate the law. *Andrews,* 585 F.2d 961. Section 1951 requires the Government to establish that a conspiracy exists and that each of the defendants knowingly contributed his efforts in its furtherance. *United States v. Pilling,* 721 F.2d 286, 293 (10th Cir.1983); *United States v. Jackson,* 482 F.2d 1167, 1173 (10th Cir.1973); *Collins v. United States,* 383 F.2d 296, 300 (10th Cir.1967). Once a conspiracy is established, only slight evidence is required to connect a co-conspirator, *Pilling,* 721 F.2d at 293; *Andrews,* 585 F.2d at 961; *United States v. Turner,* 528 F.2d 143, 162 (9th Cir.1975); *United States v. Rodriguez,* 498 F.2d 302 (5th Cir.1974), and the acts attributable to any member of the conspiracy are attributable to all other members. *United States v. Masiello,* 235 F.2d 279 (2d Cir.1956). Conspiracy cases

---

the ruling of the trial judge. Whenever any statement is delivered to a defendant pursuant to this section, the court in its discretion, upon application of said defendant, may recess proceedings in the trial from such time as it may determine to be reasonably required for the examination of such statement by said defendant and his preparation for its use in the trial.

. . . .

(e) The term "statement", as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means—

. . . .

(3) a statement however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

17. Fed.R.Crim.P. 14 states:

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election for separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or confessions made by the defendants which the government intends to introduce in evidence at trial.

may be proven exclusively by circumstantial evidence. *United States v. Henry,* 468 F.2d 892 (10th Cir.1972).

 The facts in the present case are similar to those in *Masiello.* There, the evidence was stronger against one defendant than the other, the latter of which argued he was either ignorant of or indifferent to the illegal activities. The defendants attempted to separate their roles at trial; however, the court held the evidence was sufficient to submit both cases to the jury and stated that "actually all the evidence was mosaic, each making its contribution, and all building up to a compelling whole that first the court and second the jury should actually view." *Id.* at 283. In this case, the jury weighed Troutman's claims of ignorance, indifference and good faith against evidence that he attended the first meeting at which the contribution scheme was discussed, met with ITC officials three times to discuss the contribution, requested a delay in the appointment of the correspondent, advised Governor Anaya not to appoint ITC and left in the minds of ITC officials the clear impression Troutman made the final decision on the correspondent contract for which ITC's consideration was conditioned on its payment of $2,000. Lesko, an ITC vice-president, described Johnson and Troutman as "working hand-in-hand." R. III, 19. The *Masiello* Court's "mosaic" analogue is applicable here as individual pieces of evidence, properly juxtaposed, create a compelling picture of Troutman's and Johnson's agreement and concerted efforts to place ITC in the position of making the $2,000 contribution or risking loss of the correspondent contract. The evidence was more than sufficient to link Troutman to the extortion scheme.

 Concerning severance, we have consistently held that, as a general rule, persons charged with conspiracy should be tried together. *United States v. Rinke,* 778 F.2d 581 (10th Cir.,1985); *United States v. Hopkinson,* 631 F.2d 665 (10th Cir.1980), *cert. denied,* 450 U.S. 969, 101 S.Ct. 1489, 67 L.Ed.2d 620 (1981); *United States v. McGuire,* 608 F.2d 1028 (5th Cir. 1979). The defendant has the burden of clearly showing prejudice would result from a joint trial. *Id.* Mere assertion his chances for acquittal would be better if tried separately is insufficient; he must affirmatively show that a joint trial abridges his right to a fair trial. *United States v. Parnell,* 581 F.2d 1374 (10th Cir.1978); *United States v. Jackson,* 549 F.2d 517, 523–24 (8th Cir.1977); *Masiello,* 235 F.2d 279. The decision of whether to sever rests in the district court's sound discretion and will not be disturbed on appeal absent an abuse of discretion. *Rinke,* 778 F.2d 581; *United States v. Pack,* 773 F.2d 261 (10th Cir.1985); *United States v. Rogers,* 652 F.2d 972 (10th Cir.1981). Applying these legal principles to the instant facts, we find no abuse of discretion in the district court's refusal to sever.

 Troutman's primary contention underlying the severance issue is that the district court improperly admitted statements of his co-conspirator, Johnson. The court admitted the statements pursuant to Fed.R.Evid. 801(d)(2)(E), which reads:

> (d) A statement is not hearsay if—
>> (2) The statement is offered against a party and is—
>> . . . .
>>> (E) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy.

A statement of a co-conspirator will be admitted over a hearsay objection only upon the Government's establishing by a preponderance of evidence that: 1) a conspiracy existed; 2) the declarant and the defendant against whom the declaration is offered were members of the conspiracy; and 3) the statement was made in the course and furtherance of the conspiracy. *United States v. Metropolitan Enterprises, Inc.,* 728 F.2d 444 (10th Cir.1984); *Petersen,* 611 F.2d 1313; *Andrews,* 585 F.2d 961. The preferred order of proof for Rule 801(d)(2)(E) evidence requires the Government first to introduce proof of the conspiracy independent from the co-conspirator's statements and second, to connect the defendant to the conspiracy before hearsay declarations of his co-conspirators will be admitted. *Petersen,* 611 F.2d at 1330–31. In *United States v. Harenberg,* we recog-

nized that following the preferred order is not always "reasonably practicable" and allowed the district court to admit the statements provisionally, subject to being "connected up" by subsequent independent evidence. 732 F.2d 1507, 1513 (10th Cir. 1984). "The order of proof is within the discretion of the trial judge." *Id.* (quoting *United States v. Kaatz*, 705 F.2d 1237, 1244 (10th Cir.1983)). However, absent "some substantial reason," the preferred order of proof should be adhered to. *United States v. Austin*, 786 F.2d 986, 990 (10th Cir.1986); *United States v. Behrens*, 689 F.2d 154, 158 (10th Cir.); *United States v. Calabrese*, 645 F.2d 1379, 1387 (10th Cir.), *cert. denied*, 456 U.S. 1088, 103 S.Ct. 573, 74 L.Ed.2d 934 (1982). "Failure to follow the preferred order would be the rare exception rather than the rule." *Austin*, 786 F.2d at 990.

■ At trial, Troutman first objected to the introduction of Johnson's statements during Fleming's testimony concerning Fleming's first encounter with Troutman on October 9. The district court overruled the objection after informing counsel at side-bar that the court found the Government had presented sufficient independent evidence of a conspiracy to allow introduction of hearsay statements connecting Troutman to the conspiracy. Concerning admissions of Johnson's statements made before October 9, the district court allowed the Government to proceed with hearsay evidence on the condition that it connect up the evidence. At the conclusion of the brief "connecting" testimony, the court admitted all statements and communications by Johnson or Troutman during the course of the conspiracy, including those made before October 9, 1984 because evidence showed Troutman was aware of the extortion attempt at that date. The court stated:

> I think at this point, the Government has established, for the purposes of *Peterson* [sic] and all those, that they put in enough substantial independent evidence that a conspiracy existed and that the two defendants were members of it and that statements were made during the course of and in furtherance of [it]. [A]ny statement that I detect is made in

furtherance of it will be admitted. I find that the Government had made the basic showing required under *Peterson* [sic] and all of them.

R. III, 72. After the Government rested, the court specifically ruled that to the extent a hearsay statement was entered before the above ruling was made, it was not reasonably practicable to require the showing of conspiracy prior to the admission of any such hearsay statements. R. IV, 73–74. We consider proper, under *Petersen* and its progeny, the admission of Johnson's statements against Troutman following the district court's ruling that the existence of a conspiracy was properly established. We further conclude that the Government's minor deviation from the preferred order of proof while attempting to connect Troutman to the conspiratorial events occurring before October 9 did not prejudice Troutman's trial rights in any significant manner. The evidence admitted after the connecting testimony established the term rather than the existence of the conspiracy. Moreover, the danger that an individual will be caught up in an indiscriminate general finding of guilt does not arise here where Troutman was a key rather than fringe player in the conspiracy and the evidence is sufficient to support his conviction.

■ Troutman further complains he was prejudiced by the admission of the taped conversation involving Johnson and ITC officials because Troutman's participation in the alleged conspiracy had terminated by that time. However, Troutman does not show he withdrew from the conspiracy through his affirmative action either by confessing to authorities or by communicating his withdrawal in a manner reasonably calculated to reach his co-conspirators, *United States v. Parnell*, 581 F.2d 1374 (10th Cir.1978), *cert. denied*, 439 U.S. 1076, 99 S.Ct. 852, 59 L.Ed.2d 44 (1979), and a conspiracy is presumed to continue unless a member affirmatively withdraws from it. *Id.* Furthermore, the district court specifically ruled the conspiracy continued at least until the fiscal agent contract was awarded, four days after the conversation was taped. That conversa-

tion, another attempt to coerce ITC, was conducted in the course and furtherance of the conspiracy and was properly admitted against both Troutman and Johnson.

We conclude Troutman fails to meet his heavy burden of clearly showing his right to a fair trial was prejudiced as a result of the district court's refusal to sever, and hold the district court did not err by admitting Johnson's statements into evidence.

### E. *Admission of Mike Anaya's statements for impeachment purposes*

Mike Anaya, Governor Anaya's brother, served on the Board of Finance during the previous selection of the state fiscal agent and was called by the Governor as an advisor to the Board of Finance for the present selection. Fruman testified before the grand jury that he called Anaya and told him ITC did not purchase the $2,000 tickets. Fruman telephoned Fleming at his ITC office to say Fleming should expect a call from Anaya. Anaya later called Fleming to ask for a $5,000 contribution and followed up that call by telephoning FNB officials, Colleen Maloof and Norm Corzine, who told him FNB would assure ITC's responsiveness. Anaya passed that information to Fruman on November 8, 1984, the morning FNB was appointed, and Fruman testified that information might have been conveyed to the Governor.

Before trial, the Government agreed not to introduce Fruman's testimony regarding communications from Mike Anaya during its case in chief but specifically stated it would use the testimony to impeach Fruman if Troutman opened the door.[18] The following portion of Troutman's direct examination of Fruman prompted the Government's use on cross-examination of Fruman's testimony concerning Mike Anaya's statements:

Q: Mr. Fruman, what, if anything, do you know about an attempt to exchange the correspondent bank contract in return for some kind of contribution or money?

A: Nothing.

Q: Was anything ever brought to your attention?

A: Allegations, innuendos, newspaper articles, whatever happened and brought to my attention; yes, sir.

Q: After the fact?

A: The granting of any contract in exchange for a contribution?

Q: Yes, sir.

A: Yes, sir.

R. III, 112–13.

Troutman argues Fruman's testimony regarding Mike Anaya's statements was prejudicial and outside the scope of direct examination because Fruman was asked whether he was aware of any extortionate demands made by Troutman and Johnson. However, the record reflects Fruman was questioned regarding "an attempt" to condition award of the correspondent contract on payment of money, and the names of Troutman and Johnson were not mentioned in the relevant portion of examination. Regardless of the form of the direct question, Fruman's testimony before the grand jury showed he was fully aware of Troutman's and Johnson's efforts to solicit $2,000 from ITC. Fruman's knowledge of the extortion scheme was placed in issue on direct, and Troutman should have fully expected cross-examination of Fruman on that point. In fact, during a bench conference conducted while Fruman was on the witness stand, the Government repeated its notice the testimony would be used to impeach Fruman if Troutman opened the door.

In its Order denying Troutman's motion for a new trial or judgement of acquittal, the district court observed:

The statements regarding Mike Anaya's contacts with Irving Trust were admitted on cross-examination for purposes of impeachment. Statements attributed to Mike Anaya were not admitted as co-conspirator statements under Rule 801(d)(2)(E) Federal Rules of Evidence.

---

18. The agreement was reached between the Government and FNB to allow Colleen Maloof, a material witness to Anaya's solicitation, to receive medical treatment outside the state. The district court permitted Troutman to depose Maloof, which he chose not to do.

Defendant contends further that introduction of statements attributed to Anaya was in breach of an agreement between the parties. The government apparently had agreed not to attempt to introduce those statements in its case-in-chief. Introduction of the statements to impeach a defense witness did not constitute a breach of any such agreement. Memorandum and Order at 9. The trial court has considerable latitude in its rulings on the limits of cross-examination. *Foster v. United States*, 282 F.2d 222 (10th Cir.1960). Cross examination "may embrace any matter germane to the direct examination, qualifying or destroying, or tending to elucidate, modify, explain, contradict, or rebut testimony given in chief by the witness." *Leeper v. United States*, 446 F.2d 281, 288 (10th Cir.1971). *See also Alford v. United States*, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931); *United States v. Varoz*, 740 F.2d 772 (10th Cir. 1984). Admission of rebuttal evidence, particularly when the defendant "opens the door" to the subject matter, is within the sound discretion of the district court. *Whiteley v. OKC Corp.*, 719 F.2d 1051 (10th Cir.1983).

The district court did not abuse its discretion by allowing the Government to impeach Fruman with his conflicting grand jury testimony, particularly when his credibility as a witness was at issue and the relevant portion of his testimony at trial was manifestly untrue.

## F. *Separate jury forms and mention of other co-conspirators*

▮▮▮ Troutman asserts the district court erred by refusing to excise mention of co-conspirators other than Troutman and Johnson from the indictment included in the jury instructions and by submitting separate verdict forms to the jury thereby creating the inference Troutman might have conspired individually other than with Johnson.[19]

The district court addressed these issues in its Order denying a new trial or judgment of acquittal:

Defendants contend that there was no evidence of the existence of any conspirators other than these two defendants. They claim therefore that it was error not to have excised from the indictment, as presented to the jury in the instructions, any reference to 'unindicted' co-conspirators. They also claim that it was error to have given a separate form of verdict for each defendant. They contend that if there were no other conspirators, if the alleged conspiracy was only between these two defendants, the jury would have had to find either that both defendants were guilty or that neither was guilty.

As to the reference to other conspirators in the indictment, the Court is not aware of a requirement that the indictment be tailored to conform to the evidence actually presented at trial, prior to

---

**19.** The district court read the following indictment while instructing the jury:

The Grand Jury charges that commencing on or about July 1, 1984, and continuously thereafter to on or about December 4, 1984, in the State and District of New Mexico, the Defendants Kenneth M. Johnson and Phillip E. Troutman and others known and unknown to the Grand Jury did unlawfully, willfully and knowingly combine, conspire, confederate and agree together to commit extortion, as that term is defined in Title 18, United States Code, Section 1951, which conspiracy did attempt to and did obstruct, delay and affect commerce and the movement of articles and commodities in commerce, as those terms are defined in Title 18, U.S. Code, Section 1951.

That as a part of said conspiracy, the Defendants Kenneth M. Johnson and Phillip E. Troutman and their co-conspirators demanded and attempted to obtain money and property of Irving Trust Company, to-wit: a sum of money in the amount of approximately $2,000.00 from the Irving Trust Company, its officers and shareholders, with their consent, which money and property was not due the Defendant or his office, and his consent was induced under color of official right and by the wrongful use of fear of economic harm, to wit: said Defendants and their co-conspirators used their power and positions as employees of the State of New Mexico when they informed and threatened the Irving Trust Company, its officers and shareholders, that the award of a contract to be the correspondent bank to the State of New Mexico's fiscal agent would be delayed and would be awarded to another banking institution, in whole or in part, if the Irving Trust Company failed to pay said sum of money and to deliver said property.

being read to the jury as part of the instructions. As the instructions themselves stated, 'The indictment or formal charge against a defendant is not evidence of guilt.' The indictment is simply the charge upon which the defendants were brought to trial. Moreover, there was evidence presented at trial from which the jury could have determined that other conspirators existed. In addition, as to the forms of verdict, the jury found both defendants guilty. Whether they did so on separate verdict forms or on a single form is of no importance at this stage. There is no possibility of inconsistency.

Memorandum Opinion and Order at 10.

We agree with the district court's reasoning and further note that, viewed as a whole rather than in isolation, these instructions give an accurate statement of the law. *United States v. Rothbart,* 723 F.2d 752 (10th Cir.1983); *United States v. Jenkins,* 701 F.2d 850 (10th Cir.1983); *United States v. Redmond,* 546 F.2d 1386 (10th Cir.1977), *cert. denied,* 435 U.S. 995, 98 S.Ct. 1645, 56 L.Ed.2d 83 (1978). Moreover, the court's instructions were not significantly different from those offered by Troutman, and the procedure of separating the verdict forms reflected Troutman's Requested Jury Instruction No. 4:

> If, on the other hand, you do find beyond a reasonable doubt that a conspiracy existed, then you must next consider whether beyond a reasonable doubt one or both of the Defendants was a member of said conspiracy, and you should consider each separately. If not, then as to that Defendant or both, you must return a verdict of not guilty.

The court's instructions to the jury contained essentially the same language. The jury's duty was to consider the evidence against Troutman and Johnson individually to determine the existence of a conspiracy. Where that evidence included testimony implicating other actors in the extortion scheme, separate verdict forms facilitated rather than hindered the jury's deliberation as to whether a conspiracy existed and whether each defendant acted in furtherance of it. We see no advantage to Troutman that would have resulted from a single verdict form.

The Government points out Troutman did not object to submitting separate forms until after the district court instructed the jury. We question the timeliness of the objection but need not reach that question because no error resulted from the submission of separate verdict forms.

### G. Denial of Troutman's Requested Jury Instruction regarding the awarding of contracts on the basis of political affiliation

Troutman requested a jury instruction that read, "It is not illegal, absent duress, undue influence or misuse of public office, for state contracts to be let on the basis of political affiliation." The district court refused the instruction saying there was no issue of political affiliation present. The court explained further:

> [D]efendants contend that the Court erred in refusing to instruct the jury it is not illegal for state contracts to be let on the basis of political affiliation. There was no evidence that political affiliation, as such, had anything to do with the awarding or delay in awarding of any State contracts. There was no evidence as to the political affiliation of any of the banks seeking the contract. There was no evidence that Irving Trust or its employees were being solicited to join the Democratic Party, nor indeed of what their political affiliation might have been. The evidence involved a request for a contribution to the Democratic Party, and had nothing to do with actual party affiliation. Defendants' requested instruction was properly omitted.

Memorandum Opinion and Order at 13.

The refusal of a jury instruction lies within the discretion of the district court. *United States v. Zang,* 703 F.2d 1186 (10th Cir.1983). Jury instructions should be limited to the issues present and the facts developed by the evidence. *United States v. Linn,* 438 F.2d 456 (10th Cir. 1971). An instruction reflecting an abstract statement of the law unrelated to the facts of the case may be refused. *Id.;*

*Velasquez v. United States,* 244 F.2d 416 (10th Cir.1957).

■■■ For the reasons stated by the district court, we agree the instruction is totally unrelated to Troutman's charge or any other issue in the case, and its submission would have confused the jury. The district court correctly denied the requested instruction.

### H. *Denial of Troutman's motion to compel interviews of certain Government witnesses*

Both the ITC and the FNB officials refused to be interviewed before trial by Troutman. Troutman moved to compel the interview or deposition of certain witnesses, or in the alternative, for the court to release before trial the transcripts of the witnesses' grand jury testimony. The Government responded it did not object to Troutman's interviewing any witness who desired to talk to him. The court denied Troutman's motion to compel the interviews and withheld the minutes of the grand jury transcript until portions were released after the witnesses testified on direct examination.

Troutman argues denial of access to the Government's witnesses violated his Sixth Amendment rights to a fair trial and effective assistance of counsel and his Fifth Amendment right to due process of law. He concedes the great weight of authority on these questions is against his position; however, he challenges the constitutionality of any rule that would inhibit his ability to interview government witnesses before trial and asserts "trial by ambush" resulted from his inaccessibility to the prosecution's evidence.

■■■ Regarding his claims of ineffective assistance of counsel, Troutman cites extensive authority in support of the proposition that his attorney's inability to investigate fully the case before trial rendered his assistance ineffective. We reject that proposition outright as claims of ineffective assistance rest on the attorney's deficient performance or failure to investigate the "facts disclosed to the fullest practicable extent." *Procter and Gamble,* 356 U.S. at 677, 683, 78 S.Ct. at 983, 986. Evidence

shows Troutman's counsel competently and actively investigated this case to the "fullest practicable extent," that is, to the limits of the court's ruling denying pre-trial access to grand jury minutes and refusing to compel the Government's witnesses to testify. Where Troutman does not argue his attorney's affirmative actions or omissions prejudiced his right to a fair trial, the "effective assistance of counsel" cases do not apply, and the sole question germane to this appeal is whether the court properly denied Troutman pre-trial access to grand jury minutes and certain government witnesses.

#### 1. Grand jury minutes

■■■ In 1958, the United States Supreme Court held the newly enacted section 3500 procedures respecting production of witness statements and reports in the Government's possession were not unconstitutional. *Scales v. United States,* 260 F.2d 21 (4th Cir.1958), *aff'd,* 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782, *reh'g denied,* 366 U.S. 978, 81 S.Ct. 1912, 6 L.Ed.2d 1267 (1961). The *Scales* Court reasoned:

> [T]his statutory provision ... does not amount to a denial of the due process required by the Fifth Amendment but is merely a procedural regulation which preserves certain substantial rights of the accused and at the same time protects the Government files from the danger of unnecessary disclosure of its sources of information.

> Most significant is the fact that the new statutory procedure does not deny the defendant access to any information which would be helpful to his case. Production of the reports for inspection does not depend upon the permission of Government custodians or the attorneys for the prosecution; and the determination of what should be excised is not left to the Government but is entrusted to the impartial and experienced judgment ... of the trial judge....

> The defense is denied only the opportunity to be heard on the question whether the excised portions of the reports bear on the testimony of the witnesses; and this does not amount to a denial of due

process ... but merely restricts [the defendant's] examination of the Government files which he desires to make, not because he has any reason to believe that they will yield anything helpful to his case but on the chance, which costs him nothing, that something will turn up that will weaken the prosecution. In this situation it is clearly within the province of Congress to protect the right of the United States to withhold facts which it has gathered and to shield the sources of its information in the public interest so long as no pertinent information is withheld from the defendant.... In the *Jencks* decision the Supreme Court was not dealing with consitutional questions. It was exercising ... its supervisory authority over the administration of criminal justice ... and maintaining civilized standards of procedure and evidence.

*Id.* at 43, 44. To date, the Supreme Court has not departed from *Scales*, and nothing persuades us to question the correctness of its present application.

Post-*Scales* authority holds the Government is not obligated to give transcripts of the grand jury proceedings to the defense before trial, 18 U.S.C. § 3500; *United States v. Gant*, 487 F.2d 30 (10th Cir.1973), *cert. denied*, 416 U.S. 941, 94 S.Ct. 1946, 40 L.Ed.2d 293 (1974); *United States v. Addington*, 471 F.2d 560 (10th Cir.1973), absent a showing of "particularized need" for the transcripts. *Procter & Gamble*, 356 U.S. at 683, 78 S.Ct. at 986. The defendant must show a "particularized need" of information for which the secrecy of the grand jury proceedings should be "lifted discretely and limitedly." *Id.* at 683, 78 S.Ct. at 986. Troutman contends he was entitled to the complete transcript of the minutes to allow his counsel adequate preparation for trial. That request far exceeds the *Procter & Gamble* holding that upon the showing of a particularized rather than general need, the minutes should be disclosed in a discrete and limited manner. A defendant is not permitted to probe aimlessly for conjectured error behind a facially valid indictment. *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *Costello v. United States*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956).

Even testimony potentially damaging to the defendant is protected by section 3500. *United States v. Radetsky*, 535 F.2d 556 (10th Cir.1976). Therefore, the district court properly denied Troutman's pre-trial motion for release of the grand jury minutes.

### 2. Witness interviews

The issue of whether the district court should have compelled Government witnesses to be interviewed by Troutman is governed by *United States v. Pinto*, 755 F.2d 150 (10th Cir.1985). There, this court stated,

A witness in a criminal case has the right to refuse to be interviewed. *United States v. Fischel*, 5 Cir., 686 F.2d 1082, 1092; *Byrnes v. United States*, 9 Cir., 327 F.2d 825, 832, *cert. denied*, 377 U.S. 970, 84 S.Ct. 1652, 12 L.Ed.2d 739. 'No right of a defendant is violated when a potential witness freely chooses not to talk....' *Kines v. Butterworth*, 1 Cir. 669 F.2d 6, 9, *cert. denied*, 456 U.S. 980, 102 S.Ct. 2250 72 L.Ed.2d 856. However, the prosecution may not interfere with the free choice of a witness to speak with the defense absent justification 'by the clearest and most compelling considerations.' *Id.* In the case at bar the prosecution did not impermissibly interfere with Morris' choice. *United States v. Bittner*, 8 Cir., 728 F.2d 1038, 1041–42.

*Pinto*, 755 F.2d at 152. *Pinto* is in complete accord with the holding of every circuit that has examined this question. *Bittner*, 728 F.2d 1038; *Fischel*, 686 F.2d 1082; *United States v. Walton*, 602 F.2d 1176 (4th Cir.1979); *United States v. Rich*, 580 F.2d 929 (9th Cir.1978).

The deposing of Government witnesses is governed by Fed.R.Crim.P. 15(a), which allows depositions "[w]henever due to exceptional circumstances it is in the interest of justice that the testimony of a prospective witness be taken and preserved for use at trial...." The Rule does not address pretrial discovery; it merely authorizes preservation of the testimony of witnesses who might be unavailable at trial. *United States v. Steele*, 685 F.2d 793 (3d Cir.1982);

*United States v. Adcock*, 558 F.2d 397 (8th Cir.1977). In its order denying Troutman's motion to compel interviews, the district court expressly found Troutman failed to show that any of the material witnesses from FNB and ITC would be unavailable to testify, which finding was confirmed at trial. The district court committed no error by withholding the grand jury minutes and refusing to compel witness interviews.

### I. *Exclusion of reference to Troutman's past official conduct*

Below, Troutman sought to introduce testimony from several firms, not related to the present controversy, that he had never conditioned the award of state business upon their making political contributions and that he "went out of his way" to return any donations solicited by persons in his office and assure the contributors their standing with the State would not be affected by their making or withholding contribution. The district court allowed one witness to testify along that line, but refused further like testimony and required Troutman to submit the remainder by offer of proof as per Fed.R.Evid. 103(b). Troutman asserts more evidence of his past conduct should have been admitted under Fed. R.Evid. 404(a)(1) and 406, and the court's failure to do so denied Troutman's right to present witnesses on his behalf and to effective assistance of counsel and due process of law.[20]

■■■ The Government points out that additional evidence of past conduct unrelated to the award of the correspondent contract to ITC would have been cumulative. More importantly, neither Rule 404(a)(1) nor Rule 406 covers the evidence Troutman sought to admit. The Advisory Committee Notes to Rule 404 cite as examples of character traits, "the chastity of the victim under a statute specifying her chas-

tity as an element of the crime of seduction, or the competency of the driver in an action for negligently entrusting a motor vehicle to an incompetent driver." The Committee further observes,

Character evidence is susceptible of being used for the purpose of suggesting an inference that the person acted on the occasion in question consistently with his character.... Illustrations are: evidence of a violent disposition to prove that the person was the aggressor in an affray, or evidence of honesty in disproof of a charge of theft. This circumstantial use of character evidence raises questions of relevancy as well as questions of allowable methods of proof.

As with all questions of relevancy and method of proof, the district court has broad discretion to admit evidence under Fed.R.Evid. 406. *United States v. Neal*, 718 F.2d 1505 (10th Cir.1983). Here, the district court refused further evidence of Troutman's prior conduct after hearing the testimony of one witness and permitting an offer of proof. It ruled the evidence was irrelevant, and we will not disturb that ruling absent a clear showing of abuse of discretion. *United States v. Nolan*, 551 F.2d 266 (10th Cir.1977). The central question here is the reasonability of the ITC officials' perception that award of the correspondent contract was conditioned upon their making the requested contribution. *United States v. Dozier*, 672 F.2d 531 (5th Cir.1982); *United States v. Price*, 617 F.2d 455 (7th Cir.1980). Therefore, we find no abuse of discretion in the district court's exclusion, as irrelevant, evidence concerning Troutman's conduct in matters unrelated to ITC.

■■■ Nor did the court abuse its discretion by refusing to admit that same testimony as evidence of habit under Fed.R.

---

**20.** Fed.R.Evid. 404(a)(1) states:
 (a) *Character evidence generally.* Evidence of a person's character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
 (1) Character of accused. Evidence of a pertinent trait of his character offered by an accused or by the prosecution to rebut the same; ...

Fed.R.Evid. 406 provides:
 Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

Evid. 406. The Advisory Committee comments,

> A habit, on the other hand, is the person's regular practice of meeting a particular kind of situation with a specific type of conduct, such as the habit of going down a particular stairway two stairs at a time, or of giving a hand-signal for a left turn, or of alighting from railway cars while they are moving. The doing of the habitual acts may become semi-automatic.

Extortion or refraining from extortion is not a semi-automatic act and does not constitute habit. The district court properly excluded, as irrelevant, testimony concerning Troutman's past official conduct not related to his communications with ITC.

### J. Denial of Troutman's motion for a directed judgment of acquittal or, alternatively for a new trial

Troutman argues that he merited a new trial or judgment of acquittal on the ground that solicitation of political contributions *per se* is not unlawful and his conduct did not fall within the parameters of the Hobbs Act.

■■■■■ Courts disfavor new trials, *United States v. Gleeson,* 411 F.2d 1091 (10th Cir.1969), and exercise great caution in granting them. *United States v. Allen,* 554 F.2d 398 (10th Cir.1977); *United States v. Maestas,* 523 F.2d 316 (10th Cir.1975); *United States v. Perea,* 458 F.2d 535 (10th Cir.1972). The motion for a new trial lies within the sound discretion of the district court and will not be reversed absent a plain abuse of discretion. *Maestas,* 523 F.2d 316.

On review of the district court's denial of Troutman's alternative motion for a judgment of acquittal, we must consider, in a light most favorable to the Government, all direct and circumstantial evidence and the inferences that may reasonably be drawn from that evidence. *United States v. Hooks,* 780 F.2d 1526, 1529 (10th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 1657, 90 L.Ed.2d 199 (1986); *United States v. Parrott,* 434 F.2d 294, 297 (10th Cir.1970), *cert. denied,* 401 U.S. 979, 91 S.Ct. 1211, 28 L.Ed.2d 330 (1971). The motion will be denied if *"any* rational trier of fact could

have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). The Government's evidence need not disprove every reasonable defense theory. *See Hooks,* 780 F.2d at 1530. However, the evidence supporting the conviction must be "substantial; that is, it must do more than raise a mere suspicion of guilt." *United States v. Ortiz,* 445 F.2d 1100, 1103 (10th Cir.), *cert. denied,* 404 U.S. 993, 92 S.Ct. 541, 30 L.Ed.2d 545 (1971).

■■■■ Under the Hobbs Act, conspiracy to commit extortion may be shown by evidence the defendants acted in a manner that instills in the victim the fear of economic loss if the victim does not meet their extortionate demands and by evidence the defendants conspired to obtain the funds under color of official right. Either the "fear of economic loss" or the "color of official right" showing is sufficient for conviction under the Hobbs Act. *United States v. Adcock,* 558 F.2d 397 (8th Cir.), *cert. denied,* 434 U.S. 921, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977). Fear is not an element of a violation of the Hobbs Act when funds are obtained under color of official right. *United States v. Hathaway,* 534 F.2d 386 (1st Cir.), *cert. denied,* 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976); *United States v. Mazzei,* 521 F.2d 639 (3d Cir.), *cert. denied,* 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975). The Government contends that review of the evidence in a light most favorable to the prosecution shows Troutman conspired to commit extortion both by means of fear of economic loss and under color of official right.

■■■■ Concerning the fear of economic loss element, Troutman and Johnson repeatedly stated Troutman exercised great if not exclusive influence over the Governor's decision for the award of the correspondent contract and stressed the necessity that ITC should "pay to play." The ITC officials testified they believed ITC would not secure the contract unless they met Troutman's and Johnson's demands. We agree with the district court's determina-

tion that the solicitation was made on a *"quid pro quo"* basis and that the threat of economic loss was real in the minds of ITC officials.

Regarding color of right, Troutman merely reasserts his position that he acted to protect the integrity of his office. As discussed above, we join the jury and the district court in their rejection of that view. An extortion effort made under color of official right is described as a public official's attempt to obtain money not due him or his office. *United States v. Brown,* 540 F.2d 364 (8th Cir.1976). The instant facts fit squarely within that language, and the jury was reasonable in its decision that Troutman wrongfully attempted to obtain money not due him or his office by creating an impression the award of the correspondent contract to ITC was contingent upon ITC's payment of $2,000 for tickets to the Democratic Leadership fund-raiser. Thus, regardless of the strength of Troutman's assertion the showing of fear of economic loss was inadequate, the Government met its burden of demonstrating the contribution was unlawfully solicited under color of official right.

Finally, the authority relied upon by Troutman does not support his motion for a new trial. Rather, the authority underscores that cited by the Government in opposition to Troutman's motion. *United States v. Dozier,* 672 F.2d 531, 540 (5th Cir.1982) (("[E]lected officials are, and have been, on notice that any public officer, elected or otherwise, who makes performance (or non-performance) of an official act contingent upon payment of a fee—whether or not the fee actually is paid or the act actually performed—is guilty of extortion 'under color of official right.'")); *United States v. Cerilli,* 603 F.2d 415, 421 (3d Cir.1979) ("The coercive solicitation of political contributions is within the realm of actions that are illegal under the Hobbs act."); *United States v. Williams,* 621 F.2d 123, 124 (5th Cir.1980) (Absent a showing of fear, a Hobbs Act conviction can be sustained upon a finding that property was unlawfully obtained under color of official right).

On the evidence presented, the jury was reasonable in its finding beyond a reasonable doubt that Troutman's activities met the essential elements of a Hobbs violation, and the district court properly refused to set aside the resulting guilty verdict.

### K. *Cumulative error*

Troutman claims that even if no single error cited should warrant reversal, the cumulative effect of the district court's actions denied Troutman his constitutional right to a fair trial. Our review of the trial record not only reveals no errors that diminished Troutman's constitutional rights but shows the district court was fair and thorough in its treatment of this case. We see no cumulative error, and affirm the district court's denial of Troutman's motion for a new trial or, in the alternative, for a judgment of acquittal.

AFFIRMED.