951 F.2d 1261
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 UNITED STATES of America, Plaintiff-Appellee,
v.
James L. SCARBOROUGH, Defendant-Appellant.
 No. 90-5052.
 United States Court of Appeals, Tenth Circuit.
 Dec. 10, 1991.
 
 Before JOHN P. MOORE and BRORBY, Circuit Judges, and JENKINS,* Chief District Judge.
 ORDER AND JUDGMENT**
 BRORBY, Circuit Judge.
 
 
 1
 After examining the briefs and the appellate record, this three-judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. See Fed.R.App.P. 34(a); 10th Cir.R. 34.1.9. The cause is therefore ordered submitted without oral argument.
 
 
 2
 In this companion case to United States v. Simpson, --- F.2d ---- (No. 90-5032, 10th Cir. Dec. 10, 1991), Mr. Scarborough, one of the money brokers, was also convicted of twenty-six felony counts involving conspiracy, wire fraud and misapplication of bank funds. Mr. Scarborough appeals asserting insufficiency of the evidence and an erroneous evidentiary ruling. We affirm.
 
 
 3
 * Sufficiency of the Evidence
 
 
 4
 Codefendants Mr. Simpson (bank CEO) and Mr. Phipps (purchaser of Mr. Simpson's bank stock) agreed upon a scheme to lure money from unsuspecting depositors into a small Oklahoma bank and then to divert these deposits from the bank into their pockets. Mr. Scarborough was allegedly part of this scheme.
 
 
 5
 A review of the record shows Mr. Scarborough was deeply and heavily involved. Mr. Scarborough was a money broker. On January 21, 1986, he went to Mr. Simpson's bank. While there he signed a written agreement entitled "Agreement to Pay Fees" between himself, Mr. McElroy through his attorney-in-fact Mr. Button, and Consultants of North America, Inc., whereby Mr. McElroy agreed to pay Mr. Scarborough "3 points per million dollars received." This agreement was approved by Mr. Phipps. Mr. Scarborough then called Mr. Byrnes, another money broker, and notified him the bank was seeking "funds, CDs, deposits." He made this call from the bank in the presence of Mr. Simpson.
 
 
 6
 Also on January 21, Mr. Scarborough opened a checking account at the bank, but made no deposits. He told the bank employee that money would be coming into this account by wire transfer. He then asked the employee, a stranger, what her boot size was and offered to buy her some boots as he often did this for his friends. The next day, January 22, Mr. Scarborough drew a check on this account to purchase nine cashier's checks totalling $41,600. On the following Friday, January 24, Mr. Scarborough attempted to cash a check on this account. However, at the direction of the bank's attorney, the bank president had frozen all the accounts having anything to do with Mr. Phipps' scheme including Mr. Scarborough's. When the bank president explained that he could not release the funds, Mr. Scarborough became irate and began to curse. He told the president he was responsible for money being wired into the bank and the bank would owe him $450,000.
 
 
 7
 Between January 21 and January 23 money was indeed wired into the bank--approximately $1.2 million. Mr. Simpson, the bank's CEO, ordered this money transferred into a checking account controlled by Mr. Phipps. This transfer was not authorized by any depositor nor were the depositors ever aware of the transfer. Mr. Scarborough received part of these funds on January 23, when Mr. Phipps drew checks from his account in the amount of $120,000 payable to Mr. Scarborough. Mr. Scarborough then deposited these checks in his account.
 
 
 8
 In addition, the government introduced evidence showing Mr. Simpson had booked four rooms at a resort where Mr. Scarborough and others stayed beginning January 24. During his stay at the resort Mr. Scarborough charged $1,200 at the golf shop to Mr. Simpson's account. Telephone records were introduced showing numerous telephone calls from Mr. Scarborough's number to other participants of the conspiracy, particularly Mr. McElroy.
 
 
 9
 Most significantly, the record reveals Mr. Scarborough never had a brokerage agreement with the bank, and his fees were exorbitant. One money broker testified he had never even heard of a deal where the money brokers were to receive six percent. The normal and usual fee was far less. Further, the monies deposited to Mr. Scarborough's account, $120,000, bore no relationship to the contracted amount which would have been six percent of $1.2 million.
 
 
 10
 Mr. Scarborough contends this evidence is insufficient to support the twenty-six convictions, arguing specifically that no evidence exists to establish the requisite intent. Mr. Scarborough contends the proof shows only "that he legally brokered money to the bank."
 
 
 11
 When we review the evidence we look both to the direct and to the circumstantial. Evidence of intent is rarely direct evidence, but instead is usually found in the circumstantial evidence. The test of circumstantial evidence is not that it excludes every reasonable hypothesis of innocence, but rather whether a rational trier of fact could look at the evidence and reasonably infer its conclusion.
 
 
 12
 The record contains sufficient facts to support the jury's finding of intent on all charges. The logical inferences to be drawn from the evidence cited above would establish that Mr. Scarborough voluntarily joined the conspiracy established by Mr. Simpson and Mr. Phipps, that he aided and abetted in the transfer of depositors funds to the bank well knowing these funds were to be diverted into his accounts, and that he well knew the funds transferred into his account were, in fact, bank funds.
 
 II
 Evidentiary Ruling
 
 13
 During the course of the trial, various statements of Mr. Scarborough's coconspirators were offered into evidence, such as Mr. Simpson asking for a meeting, Mr. Phipps discussing his investment scheme, etc. Mr. Scarborough contends those statements should not have been admitted into evidence without the trial court first finding a conspiracy existed that involved him. Mr. Scarborough concedes the trial court made such a finding but asserts it was made too late, after the coconspirator's statements had already been introduced.
 
 
 14
 Coconspirator statements are admissible as nonhearsay under Fed.R.Evid. 801(d)(2)(E). We have held the trial court must determine that the evidence shows defendant was a member of the conspiracy and the statements were made during the course of and in furtherance of the conspiracy. United States v. Johnson, 911 F.2d 1394, 1403 (10th Cir.1990), cert. denied, 111 S.Ct. 761 (1991). While the preferred order of proof requires the government to introduce evidence of the conspiracy prior to the admission of coconspirator statements, we have held it is proper to receive such evidence subject to subsequent connection by independent evidence. United States v. Hernandez, 829 F.2d 988, 993 (10th Cir.1987), cert. denied, 485 U.S. 1013 (1988); United States v. Troutman, 814 F.2d 1428, 1447-48 (10th Cir.1987).
 
 
 15
 The trial court's decision to admit the coconspirators' statements was proper.
 
 
 16
 The judgment of the district court is AFFIRMED.
 
 
 
 *
 The Honorable Bruce S. Jenkins, Chief Judge, United States District Court for the District of Utah, sitting by designation
 
 
 **
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir.R. 36.3